STATE of Tennessee, Appellee,

v.

**Edward Anthony GLEBOCK, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

Feb. 26, 1981.

Permission to Appeal Denied by Supreme Court on May 11, 1981.

Hal Gerber, Ronald D. Krelstein, Memphis, for appellant.

William M. Leech, Jr., Atty. Gen., Nashville, Jennifer Helton Small, Asst. Atty. Gen., Nashville, Michael B. Neal, Sidney P. Alexander, Asst. Dist. Attys. Gen., Memphis, for appellee.

## OPINION

TATUM, Judge.

The defendant, Edward Anthony Glebock [1], was convicted of assault with intent to commit first degree murder for which his punishment was fixed at not less than 5 years nor more than 21 years in the State penitentiary. He was also found guilty of committing the felony with a firearm for which he was sentenced to serve an additional 5 year consecutive sentence under T.C.A. § 39–4914. On this appeal, he insists that the trial court erred in failing to strike

---

1. The defendant's given name was Edward Anthony Glebock. His name was lawfully changed on his application to Edward Anthony Gale.

a portion of the victim's testimony which was induced by hypnosis, that the evidence does not support the verdict, that he was deprived of Federal and State due process occasioned by the State's delay in investigating the case, that the trial judge erred in permitting certain evidence and in giving jury instructions, and that the prosecution engaged in misconduct. After considering the record and the briefs, we have determined that the judgment of the lower court must be affirmed.

The defendant was convicted of shooting his ex-wife, Barbara D. Moore, four times in the neck with a pistol. The victim's wounds were not fatal, but one bullet struck her spinal column, paralyzing her body from the neck down.

The defendant and Ms. Moore lived together as husband and wife in Cleveland, Ohio. They separated many times during their marriage, but their final separation occurred in February, 1974. In May, 1975, she was granted an absolute divorce from the defendant, and she moved to Memphis in September, 1976. She married Michael Moore in May, 1977. At the time of the shooting, she was a student at Memphis State University.

Having received a degree in industrial engineering, the defendant worked as an engineer. Evidence indicates that he was an expert with firearms and an expert marksman and that he had particular interest in combat stress-type shooting. He has conducted a study of electronic surveillance and other investigative and intelligence techniques. He also had limited aviation training.

There was proof that the victim moved to Memphis to escape the defendant's extreme harassment of her. She took great precaution in moving to conceal her destination from the defendant and went to great length after moving to prevent the defendant from being able to locate her. There was evidence that after their separation and before she moved to Memphis that the defendant threatened her on diverse occasions, followed her, tapped her telephone, habitually took her garbage to investigate its contents, broke into her apartment, and otherwise interfered with her privacy and tranquility.

While living in Memphis, she was using the surname of "Davis," which was her mother's maiden name. Though she had an unlisted telephone number, in February, 1978 she recognized the defendant's voice as that of a person who was calling her on a pretext of interviewing her for a newspaper. He called her again the next day. About two days before the shooting of January 18, 1979, she recognized his voice over the telephone and hung up.

At approximately 12:10 P.M., Central Standard Time, on January 18, 1979, she approached her automobile after leaving a history class at Memphis State University. She noticed a black van with Alabama license plates parked unusually close to her automobile. She then observed the defendant next to the van with his right hand inserted in a paper sack. Before she could get away, the defendant grabbed her, pointed the bag to her face and shot her. As he was attempting to get her into the van, he said, "You're coming with me, babe." She managed to break away and ran; she was shot again and fell to the ground. She remembers the defendant's standing over her and dropping "metal pieces" to the ground.

Other persons appeared on the scene immediately. They found four cartridge cases near her body. She informed these witnesses that her "ex-husband, Ed Glebock" had "hit her" with a bag and that he was in a black van. One of the witnesses observed that a black van was parked in a corner of the parking lot and left about the time the police arrived. She likewise told the investigating officers that the defendant had committed this crime.

About 2:30 P.M. on the date that the crime was committed, a security officer at Memphis State University inspected the victim's automobile. He found marks on the rubber gasket between the two windows on the driver's side where a coathanger or other instrument had been inserted. The door handle of the automobile on the driver's side had been removed. The car was

not in this condition when the victim left it that morning. Later that day, it was learned that the battery cable had also been disconnected.

Prior to the commission of the crime, the defendant had gone to great length in his pursuit of information about the victim. In December, 1976, a "John Skoto" wrote to Ms. Dorothy C. Thompson, a private detective in Memphis, asking her to locate a "skipper" named Barbara Ellen Davis. With the request was a detailed description of the victim, including her dress size, and other detailed information about her and her family. A photograph was also enclosed. Ms. Thompson obtained the victim's address and place of employment and forwarded this information to "John Skoto" on December 20, 1976. There is overwhelming evidence, including the defendant's admission, that this information was procured by the defendant, employing a scheme using the fictitious name of "John Skoto."

Furthermore, the defendant somehow ascertained the fact that the victim had married Mr. Michael Moore because on September 28, 1978, Ms. Thompson received a telephone call from "John Skoto" who requested her to check for employment and other information concerning "Michael D. and Barbara Moore at 7622 Stout Road." The victim and Mr. Moore had moved to this address on their marriage. Ms. Thompson did not know that Barbara Davis and Barbara Moore were the same person. Ms. Thompson procured the information requested and forwarded it to "John Skoto." Again, it was definitely established, and admitted, that the defendant had used the fictitious name "John Skoto" as an investigative technique and that he had received this information from Ms. Thompson.

The defendant's defense was an alibi. He testified that he was visiting in the home of his friends, Dr. and Mrs. Barry Portnoy in Pulaski, Virginia from Tuesday, January 16, 1979, until about noon [2] on Thursday, January 18, 1979 and could not have committed this crime in Memphis at approximately 12:10 on January 18. The defendant did not "quite remember" whether he saw Dr. Portnoy on the morning of January 18.[3] He testified that on his return to Cleveland, Ohio from Pulaski, Virginia, he had car trouble at Wheeling, West Virginia and spent the night sleeping in his camper truck at Wheeling. He testified that he arrived in Cleveland at 9:00 A.M. on January 19, 1979.

Dr. Portnoy testified that he and the defendant were close friends and shared an enthusiasm for hunting and firearms. He testified that he left his home in Pulaski, Virginia to go to the hospital at about 10:30 or 11:00 A.M. on January 18 and that the defendant was at his house when he left for the hospital.

Mrs. Portnoy testified that Dr. Portnoy left home at 10:45 or 11:00 and that the defendant left for Ohio shortly after her husband at about 11:00 or 11:30. She stated at another point "Ed left when he (Dr. Portnoy) did." [4]

There was much evidence introduced concerning records kept by airports and requirements for filing flight plans by pilots. There was no record of the defendant having made a flight from the vicinity of Pulaski, Virginia to Memphis on the day of the shooting. We will not undertake to summarize this voluminous testimony, but it leaves no doubt that it is possible to fly from Pulaski, Virginia to Memphis, Tennessee in a private airplane without making a record of the flight, takeoff and landings. Even less effort is made by airport personnel to make records of passengers in person-

---

2. Pulaski, Virginia is in the Eastern Time Zone and Memphis, Tennessee is in the Central Time Zone. All times related by the defendant and Dr. and Mrs. Portnoy are given in Eastern Time which is one hour later than Central Time. The crime occurred at about 12:00 P.M. Central Time.

3. He had given a pre-trial statement saying that he did not see Dr. Portnoy that morning.

4. Mrs. Portnoy gave a pre-trial statement, saying that her husband left home about 9:00 or 9:30 A.M., and also made a pre-trial statement that her husband had left home about 8:30 or 9:00 A.M. As stated, this is Eastern Standard Time.

ally owned or chartered aircraft. The flight time varies according to the type of plane involved and the weather conditions at the time of flight. For example, some propeller-driven, twin-engine airplanes could make the flight at a minimum of one hour and forty-five minutes under ideal conditions. The maximum time required for this flight in these twin-engine airplanes, under the most adverse conditions, is two and one-half hours. Many other types of twin-engine propeller planes could make the flight in less than two hours. Jet airplanes which are obviously faster than twin-engine propeller planes, could make the flight in even less time. Some single-engine propeller planes could make the flight under three hours. It was stipulated that on January 18, 1979, flying conditions were good.

■ In his attack upon the sufficiency of the evidence, the defendant argues "the possibility of his being able to fly undetected from Pulaski, Virginia to Memphis, Tennessee and back again was established, if at all by circumstantial evidence." He then asserts that the circumstantial evidence must exclude every other reasonable hypothesis "but that of guilt." He cites *Overton v. State*, 521 S.W.2d 229 (Tenn.Cr.App. 1974); *Crouch v. State*, 498 S.W.2d 97 (Tenn.1973); *Montesi v. State*, 220 Tenn. 354, 417 S.W.2d 554 (1967). These cases, and the many more of like import, are not in point. The defendant's guilt was established by the direct testimony of the victim that the defendant was her assailant. The State is not required to prove either in circumstantial evidence cases or direct evidence cases how the accused was able to be at the scene of the crime; it is sufficient to prove that he was there and committed a crime.

More importantly, the defendant insists that since the victim was hypnotized about three months after the shooting, much of her testimony was incompetent, leaving insufficient competent evidence to support the verdict. About three months after the crime was committed, the victim was placed in a light level of hypnosis in an effort to refresh her memory of other details of the crime, specifically the license number of the black van. She could not recall the license number of the van, but her memory was refreshed to the extent that she recalled seeing a second man sitting in the van and observed radio equipment in the van and other minor details. The hypnosis did not bring about her recollection that the defendant was her assailant, was in a black van with Alabama license and the other principal facts; she related these facts to numerous people at the scene of the crime and in the hospital before recovery.

It is difficult to distinguish all of the details originally remembered by her from some of those recalled by hypnosis. This difficulty was created by the defendant at trial. That is, during the victim's direct examination, the District Attorney General undertook to show by the witness what she remembered before being hypnotized and what additional facts she remembered after the hypnosis. The defendant objected to the State's bringing out the fact that the victim was hypnotized on the ground that the jury might give more weight to her testimony because of the fact that she was hypnotized. The trial judge sustained the defendant's objection; thus, her testimony was fully completed with no further mention of the hypnosis or reference as to which part of her testimony was induced by hypnosis. On the next day after the victim had finished her testimony, the defendant moved that all of the victim's testimony resulting from the hypnosis be struck except as to facts she related prior to the hypnosis to witnesses at the scene and gave to the police officers while in intensive care at the hospital.

■ Under these circumstances, any error was waived for failure to make contemporaneous objection to the evidence. As previously stated, the defendant was responsible for the plight of the record. See Rule 36(a), T.R.A.P.

Thus the objection, entered after the witness had been excused, came too late to avoid waiver under Tennessee case law. *O'Neil v. State*, 2 Tenn.Cr.App. 518, 455 S.W.2d 597 (1970); *Anderson v. State*, 207 Tenn. 486, 341 S.W.2d 385 (1960); *McCor-*

*mick v. State,* 135 Tenn. 218, 186 S.W. 95 (1916). See also D. Paine, *Tennessee Law of Evidence,* § 182 (1974).

■ It is mandatory that a litigant object to incompetent evidence when offered; and if he fails to do so, he has waived any objection that he might have. *McCracken v. State,* 548 S.W.2d 340 (Tenn.Cr.App. 1976). *See also Whitnel v. State,* 564 S.W.2d 373, 375–76 (Tenn.Cr.App.1978).

■ The defendant, by not timely entering a prompt objection invited, participated in and allowed the developments that occurred. Thus, the defendant is not now in a position to seek advantage from an alleged error which he invited and in which he participated. See *Norris v. Richards,* 193 Tenn. 450, 246 S.W.2d 81 (1952); *Martin v. State,* 157 Tenn. 383, 8 S.W.2d 479 (1928).

On his motion for a new trial, the defendant introduced the testimony of Mr. Joe G. Prescott, a certified hypnosis consultant who hypnotized the victim, and also Dr. Allen Overton Battle, a clinical psychologist with training and experience in hypnotism. As stated, the victim was placed under hypnosis in an attempt to obtain further information concerning the crime itself, particularly the license number of the black van. She was first hypnotized on April 4, 1979. During this session, the hypnotist spent most of the time hypnotizing and deepening the hypnosis. A second session was held on April 17, 1979 in which she was placed in a light level of hypnosis and questioned extensively about the crime. A tape recording was made of this session and later transcribed. The tape and the typed transcript were made available to the defendant. An attempt had been made to tape the first session, but it was garbled. The hypnotist, in examining her, did not suggest to her answers to the questions propounded.

Dr. Battle testified that he had examined the transcript of the hypnotic session of April when the victim was examined fully about the crime. Dr. Battle testified that while there were some suggestions made to the victim by the hypnosis, "the way in which the interview was conducted was quite good."

Dr. Battle testified that under hypnosis, a person's capacity to remember is greatly increased. If the patient has never registered the material that is to be recalled in the first place, then he might confabulate. Dr. Battle explained this term:

> "In other words, when an individual under hypnosis is told that such and such is the case and that they [sic] are reliving and remembering this and that and the other thing, they will remember it even if it is not in the consciousness to begin with."

A person is capable of telling a willful falsehood while under and after hypnosis just as a person who has not been hypnotized may do.

From the transcript, Dr. Battle was of the opinion that the victim was placed in "a very light level of relaxation which aids a person to concentrate better." He was of the opinion that due to the victim's highly traumatic experience, a deeper level of hypnosis was required to cause her to recall a repressed memory. A person under the level of hypnosis that the victim was placed cannot be made to do things that violate his moral or ethical code of conduct, such as lie or commit perjury.

The admissibility of hypnotic evidence is discussed in 92 A.L.R.3rd 442. Section 8 cites and discusses many cases dealing with the admissibility of testimony of witnesses whose memories have been recalled or induced through pre-trial hypnosis. This is a question of first impression in this state; but after reading many authorities, we think that the sound and prevailing rule, though not universal, is that stated by the 9th Circuit, U. S. Court of Appeals in *United States v. Adams,* 581 F.2d 193, 198–199 (note 12) (9th Cir.1978):

> "Until today we have considered only in civil actions the admissibility of testimony based on memories refreshed under hypnosis. We have held that the fact of hypnosis affects credibility but not admissibility. *Kline v. Ford Motor Company, Inc.,* 523 F.2d 1067, 1069 (9th Cir.1975); *Wyller v. Fairchild Hiller Corp.,* 503 F.2d 506, 509 (9th Cir.1974).

Other courts considering this problem in the context of criminal trials have generally followed the same approach. *State v. Jorgensen*, 8 Or.App. 1, 492 P.2d 312, 315–16 (1971); *Harding v. State*, 5 Md. App. 230, 246 A.2d 302, 311–12 (1968). Reversals have been predicated only on the failure to disclose the fact of hypnosis. *United States v. Miller*, 411 F.2d 825 (2d Cir.1969); *Emmett v. Ricketts*, 397 F.Supp. 1025 (N.D.Ga.1975) (habeas writ issued). We believe this reasoning is sound.

We are concerned, however, that investigatory use of hypnosis [footnote 12, supra] may later be called upon to testify in court carries a dangerous potential for abuse. Great care must be exercised to insure that statements after hypnosis are the product of the subject's own recollections, rather than of recall tainted by suggestions received while under hypnosis.

Although we do not approve of the hypnosis methods use here, [footnote omitted] Adams did not object to the adequacy of the foundation laid for the receipt of the testimony. Rather, he attempted to exclude all in-court testimony of Morin on the grounds that no testimony from witnesses who had been hypnotized could be reliable, and that the use of testimony of a witness who has been hypnotized would deny the defendant his Sixth Amendment right to confrontation and his right to call witnesses on his own behalf. The predicate for both constitutional arguments is that the in-court testimony of a witness who had earlier been subject to hypnosis is unreliable as a matter of law rendering the witness legally incompetent to testify. We rejected that premise in *Kline v. Ford Motor Company, Inc., supra*, and we see no reason for a different result in the context of a criminal case."

The safeguard required is given in footnote 12 of the *Adams* opinion:

"12. We think that, at a minimum, complete stenographic records of interviews of hypnotized persons who later testify should be maintained. Only if the judge, jury, and the opponent know who was present, questions that were asked, and the witness's responses can the matter be dealt with effectively. An audio or video recording of the interview would be helpful."

We first note that the State furnished the defendant a copy of the transcript of the interview during which the victim's memory was refreshed by hypnosis and also made available the video recording of the interview.

■ Although we agree with the *Adams* court that a foundation should be laid for the receipt of such evidence by an expert who hypnotized the witness, this is of no avail to the defendant because, as stated previously, he failed to make a contemporaneous objection to the testimony of the witness on this ground. His contemporaneous objection was directed at the jury being informed that she had been hypnotized. His motion to strike was not based on the failure to lay the proper foundation; he based the motion on the proposition that the witness could not testify as to facts she recalled as a result of hypnosis under any circumstances. *See, Shrader v. State*, 4 Tenn.Cr.App. 478, 472 S.W.2d 916 (1971); *Patterson v. State*, 184 Tenn. 39, 195 S.W.2d 26, 28–29 (1946).

■ In laying the foundation for the admission of the testimony from a witness whose memory was refreshed by hypnosis, the expert should describe the manner in which he conducted the hypnotic session without relating to the jury what the witness had told him during hypnosis.[5] The expert witness should also be asked to testify as to whether one under hypnosis has an increased capacity for recollection, what could bring on confabulation, and whether

---

**5.** The opposition may use this transcript in cross-examining the witness who had been hypnotized, but ordinarily the party introducing the witness should not be permitted to show on direct examination what the witness told the hypnotist while under hypnosis. There may be instances when the cross-examination is of such nature as to enable the party introducing the witness to use the transcript on redirect.

one who is or has been hypnotized has the capacity for telling deliberate falsehoods or lies.

■ Finally, we discern that the facts remembered by the victim as a result of the hypnosis did not affect the result of the trial. Before she was taken from the scene of the crime, she described the pertinent facts to the people who gathered about her while she was lying on the parking lot. She identified the defendant by name as being the assailant. She gave the bystanders a description of him and told them that he was in a black van. She knew that he had his right hand in a sack, although she thought at the time that he "hit her" with the sack. She apparently was not aware at the time of the fact that she had been shot. Her added recollection after hypnosis revealed the presence of another man, radio equipment being in the van, and other matters unrelated to the defendant's guilt or innocence. We find that the facts recalled by the witness after hypnosis to which she testified did not affect the judgment or result in prejudice to the judicial process. *See* Rule 36(b), T.R.A.P.

There was sufficient evidence upon which a rational trier of fact could be convinced of the defendant's guilt beyond a reasonable doubt. Rule 13(e), T.R.A.P., *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979).

■ In his next issue, the defendant says that he was denied constitutional due process by the State's failure to promptly and prudently investigate the case, in that police failed to broadcast for the black van immediately after the crime was committed and failed to make prompt inquiry at various airports near Pulaski, Virginia and Memphis, Tennessee. The defendant cites no authority in support of this novel proposition; there is none. This issue is without merit.

■ The defendant next says that the court erred in permitting the State to prove the feasibility of flying from Pulaski, Virginia to Memphis, Tennessee without leaving any trace of the flight. He argues that

this evidence contravenes the rule that established physical facts are controlling over direct testimony when it is impossible to reconcile the physical facts with the direct testimony. He cites *Cleveland Wrecking Company v. Butler*, 57 Tenn.App. 570, 421 S.W.2d 380 (1967); *Camurati v. Sutton*, 48 Tenn.App. 54, 342 S.W.2d 732 (1960); *Gordon's Transports v. Bailey*, 41 Tenn.App. 365, 294 S.W.2d 313 (1956). The fallacy in the defendant's argument is that he established no physical fact. That there was no record of his having traveled from Pulaski to Memphis does not establish as a physical fact that he did not make the trip. Nor was his alibi evidence to the effect that he was in Pulaski, Virginia on the morning of the crime, an established physical fact.[6] It was competent for the State to show that even if the jury believed that he was in Pulaski, Virginia on the morning of January 18, it was possible for him to travel by air to Memphis, Tennessee in time to commit the crime. It was not the State's theory, as insisted by the defendant, that because it was possible for him to make the trip he was guilty of the assault in Memphis, Tennessee. The State relied upon the direct testimony of the victim to prove the defendant's guilt.

■ The defendant also insists that the trial judge erred in permitting evidence that he broke into her apartment in March, 1975. He also complains of the trial judge's admitting evidence of a threatening post card received by the victim in August, 1975. There was evidence that the post card was sent by the defendant.

As outlined above, there is evidence that the defendant was persistent in abusing and harassing the victim from the time they were separated until the crime was committed. These two incidents were but two episodes in this chain of events which was broken only for a relatively short period after the victim moved to Memphis and before he learned of the victim's whereabouts through his persistent investigation. The relations existing between the victim

6. The defendant says in his brief that the State stipulated that he was in Pulaski, Virginia on the morning of January 18. We find no such stipulation in the record.

and the defendant prior to the commission of the crime are relevant. These relations indicate hostility toward the victim and a settled purpose to harm or injure her. *See Ingram v. State*, 1 Tenn.Cr.App. 383, 443 S.W.2d 528 (1969); *Burnett v. State*, 82 Tenn. (14 LEA) 439 (Tenn.1884).

 The defendant also complains that the trial judge admitted evidence that about 2:30 on the afternoon of the shooting, it was discovered that the door of the victim's automobile had been tampered with as above described and that a battery cable had been removed. The defendant insists that there was no evidence offered to show when the tampering took place; we disagree. The victim's testimony that her automobile was not in this condition when she left it that morning leaves the inference that the tampering was done between the time the victim left it to go to her class and when she was shot. We think that the evidence is relevant as it infers that the person who shot the victim tampered with the automobile to render her escape impossible. *State v. Banks*, 564 S.W.2d 947 (Tenn.1978).

Although we think this evidence was competent, we must overrule this issue because the defendant did not object to the evidence and waived any error. Rule 36(a), T.R.A.P.; *State v. Sutton*, 562 S.W.2d 820 (Tenn.1978).

 In the next issue, the defendant attacks the trial judge's jury instructions in several respects. He says that the trial court erred in instructing the jury that "if there are any conflicts in the statements of the different witnesses, it is your duty to reconcile them, if you can, for the law presumes that every witness has sworn to the truth...." This is a correct statement of Tennessee law. *Hull v. State*, 553 S.W.2d 90 (Tenn.Cr.App.1977); T.P.I.—Crim. 3701. Furthermore, this instruction is not unconstitutional. *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

 The defendant next complains that the trial judge told the jury that the use of a deadly weapon in a homicide raised a presumption of malice which would support a verdict of murder unless other facts and circumstances rebutted this presumption.

He insists that this language placed the burden of proof on him and thus deprived him of constitutional due process. In *Armes v. State*, 540 S.W.2d 279 (Tenn.Cr.App. 1976), this court, speaking through Judge Duncan, discussed this question in detail and reached a result contrary to the defendant's contention. The jury instruction given in the instant case is substantially the same as that given in the *Armes* case. This contention is overruled on authority of *Armes v. State, supra.*

 The defendant next complains that the trial judge refused his special request to charge the jury:

"A fact cannot be proved by circumstances which are perfectly consistent with direct, uncontradicted and unimpeached testimony that the fact does not exist."

This instruction is an apparent attempt to prevent the jury from considering the State's rebuttal evidence that the defendant could have flown from Pulaski, Virginia to Memphis, Tennessee. The requested charge was not supported by the evidence in that the defendant's alibi defense was not established by "direct, uncontradicted and unimpeached testimony." The alibi evidence was contradicted by the State's evidence that the defendant was in Memphis, Tennessee at approximately 12:10 P.M., Central Standard Time and committed this crime. The defendant's witnesses on the alibi issue did not stand unimpeached. The facts in this case are analogous to the facts in *Griffin v. State*, 599 S.W.2d 274 (Tenn.Cr. App.1979) where the defendant contended that since there was no record of him signing out of a work release program, he had an "iron-clad" alibi. In rejecting this contention, this court reiterated that a defense of alibi creates a question of fact for the jury and the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. The requested instruction would have taken the alibi issue from the jury. The trial judge properly refused this instruction.

 The defendant next complains of several acts of prosecutorial misconduct. He complains of the Assistant District Attorney General cross-examining him about

a lock pick and flash light found in his possession on the occasion when he broke into the victim's apartment. The defendant made no objection to this evidence and thus did not preserve the question for appellate review. Rule 36(a), T.R.A.P. The same is true with respect to questions asked the defendant relating to an episode involving one Bill Forsburg.

The defendant also complains of prosecutorial misconduct because the victim made an unresponsive reply to a prosecution question that she and a friend had "discussed the possibility" that the defendant killed the friend's husband. This was not prosecutorial misconduct and this evidence was cured when the trial judge instructed the jury to disregard it. *Bennett v. State*, 530 S.W.2d 788 (Tenn.Cr.App. 1975); *Craig v. State*, 524 S.W.2d 504 (Tenn.Cr.App.1974). There was no manifest necessity for the trial judge to order a mistrial and he did not abuse his discretion. *Franks v. State*, 541 S.W.2d 955 (Tenn.Cr. App.1976); *State v. Malouf*, 199 Tenn. 496, 287 S.W.2d 79 (1956).

The defendant next complains of the following statement made by the District Attorney General in final argument:

"Anybody that can design a laser sight for a machine gun to conceal in a briefcase to be used to assassinate people with is capable of getting from Pulaski, Virginia to Memphis, Tennessee in an airplane without leaving a record."

Defense counsel made no objection to this argument but asked us to reverse this conviction because the trial judge did not do so. This we decline to do. Without deciding that this argument was improper in context to this case, we again say that the question was not preserved for appellate review. Rule 36(a), T.R.A.P.; *State v. Sutton, supra; Rye v. State*, 532 S.W.2d 941 (Tenn.Cr. App.1975).

From our review of this 10-volume record, we find no prosecutorial misconduct. No lawyer is likely to be free of error in a trial as lengthy as this but no court has ever placed a standard of perfection on any lawyer representing either the State or the defendant. Our review of this record reflects that the defendant was given a fair trial. That is all to which he is entitled; there are no perfect trials.

The judgment of the lower court is affirmed.

DAUGHTREY and SCOTT, JJ., concur.