## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## DECEMBER 1998 SESSION



FILED

May 17, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | |
| | ) | |
| Appellee, | ) | **C.C.A. No. 03C01-9712-CR-00526** |
| | ) | |
| vs. | ) | **Sullivan County** |
| | ) | |
| **HARRY DAVID JOHNSON,** | ) | **Honorable R. Jerry Beck** |
| | ) | |
| Appellant. | ) | (First Degree Murder) |
| | ) | |

FOR THE APPELLANT:

ROBERT C. NEWTON
900 Anderson Street
Bristol, TN 37620

PAUL R. WOHLFORD
900 Anderson Street
Bristol, TN 37620

GARY E. BREWER
P.O. Box 2046
Morristown, TN 37816-2046

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ELIZABETH B. MARNEY
Assistant Attorney General
425 Fifth Avenue North
2d Floor, Cordell Hull Bldg.
Nashville, TN 37243-0493

TERESA M. SMITH
JOSEPH EUGENE PERRIN
Asst. Dist. Attorney General
P.O. Box 526
Blountville, TN 37617

OPINION FILED: _____

**AFFIRMED**

**JAMES CURWOOD WITT, JR., JUDGE**

**OPINION**

The defendant, Harry David Johnson, appeals his conviction in the Sullivan County Criminal Court where a jury[1] found him guilty of the first degree murder of his wife, Katherine Trotter Johnson. The trial court sentenced him to incarceration for life. In this appeal, the defendant raises the following issues:

1. the evidence of premeditation and deliberation is insufficient to support the verdict of first degree murder;

2. the trial court erred in allowing the state to cross-examine defense witnesses about the defendant's prior violent acts against the victim;

3. the trial court erred in instructing the jury about the range of punishment for the various degrees of homicide; and

4. the trial court failed to give the jury a special instruction concerning the meaning of "passion."

Upon oral argument and our review of the briefs, the record, and the law, we affirm the judgment of the trial court.

The defendant and the victim lived in an A-frame residence in a lake community on Friendship Road in Sullivan County. The defendant is a pharmacist. The couple had two daughters, Whitney Johnson and Arin Bence Johnson, ages 20 and 22, respectively, at the time of trial. By all accounts in the proof, the victim suffered from chronic alcoholism and was given to bouts of intoxication despite several efforts to control her disease through rehabilitation. She was extremely intoxicated at the time of her death.

Arin Johnson testified for the defense that on June 21, 1995, the defendant came home and had some words with the victim in the kitchen, which is

---

[1] The jury was composed of Hamblen County residents although the trial was conducted in Sullivan County. The trial court ordered the Hamblen County jury selection in response to the defendant's motion for change of venue.

2

located on the middle floor of the three-level home. The defendant then went to the lower level and began folding blankets where he had been sleeping since "assault charges" were filed. Arin Johnson testified the defendant did not look like himself. His eyes looked "black," and he seemed sad, cold, distant, and depressed. His chin quivered. She had never seen him in that condition before. However, when she left to return to afternoon classes, the household was calm and there was no reason for alarm.

Later in the afternoon of June 21, Whitney Johnson went to the residence of her boyfriend, Bradley Jason Fields, and called home to tell her father that she was going to a meeting. She became upset when the defendant hung up on her. Because she was worried, she asked Fields's mother and sister to drive her home. When she arrived at the Johnson residence a half hour later, she found a note affixed to the door of the house, although she did not read it at that time. She was concerned about the welfare of the defendant, went to look for him, and found him at the rear of the house seated in a swing with a shotgun propped up against a tree nearby. She testified the defendant "wasn't the person that I knew." The defendant told her that had she not called earlier, she would have found him dead. They sat in the swing and talked for about 30 minutes. Bradley Jason Fields arrived and entered the Johnson home. Whitney Johnson joined him in the kitchen, and they began to make some tea. When they discovered they were out of sugar, the defendant drove to a store to buy sugar. When he returned, Whitney Johnson made tea, and she and Fields went to her bedroom to watch television. The defendant was in the lower level of the house.

Sometime later the defendant went from the lower level to the third floor where the victim's bedroom was located. Whitney Johnson heard "a thunk" and went upstairs to see what happened. The victim was sitting on the bedroom floor, and the defendant was sitting on the edge of the bed. The victim was "snarling" at the defendant who had the "look of a black hole type person." The

3

defendant became enraged. He "smacked" the victim and said he was going to shoot her. He left the room very quickly and went downstairs. As he came back very quickly from the lower level with the shotgun, Whitney Johnson met him and tried to get the gun away from him. She testified the defendant was "screaming, out of control." He loaded the gun and ran upstairs to the third-floor bedroom where the victim had remained. Whitney Johnson testified that only seconds elapsed between the defendant running upstairs and the firing of a shot.

Bradley Jason Fields, who testified for the state, gave a somewhat different account of the June 21 events. He stated that the victim was intoxicated and, in his opinion, could not walk. He testified that after the defendant returned from his errand in his car, the defendant played with the family dogs for several minutes and seemed calm. However, later the defendant went upstairs and threatened to kill the victim. The defendant come down the stairs, passed Fields in the kitchen area, and proceeded to the lower level to the gun cabinet. Fields followed him down the stairs, and the defendant said, "I was going to kill that bitch." The defendant obtained the shotgun and the box of shells and rambled about the victim not getting his money and that he was going to kill her. Fields tried to stop him, and the defendant ordered Fields out of the way. Frightened, Fields stepped back, allowing the defendant to go upstairs. Fields went to the second floor and watched and heard the confrontation from the kitchen-great room area. The bedroom opened onto a balcony which was visible through an atrium from the second-floor kitchen-great room area. Fields testified that the defendant pulled the victim off the bed onto the floor, pointed the gun at her, and told her he was going to kill her. The defendant told the victim she was not going to get his money and that he was tired of living the way he had been. Fields pleaded with him not to kill the victim. He described the defendant looking at him and saying that he had to do what he had to do. During this time, the victim was hollering Fields's name. This situation continued for about five minutes before the defendant fired the fatal shot and came running downstairs. When the defendant reached the kitchen level, he

4

began looking for the shells which Fields had hidden under a pillow. The defendant stated "I killed her," laid the gun on a couch on the lower level, and left the house.

Fields went upstairs and discovered the victim had been shot in the head. The defendant drove off in his automobile but returned to the home a few minutes later at the same time the first law enforcement officer arrived. This officer arrested the defendant and described the defendant as merely standing in the driveway, not crying or shaking. The officer, whose weapon was drawn, three times ordered the defendant to raise his hands before the defendant complied. The defendant spoke only to ask the officer if the officer knew who he was.

The note which Whitney Johnson initially saw affixed to the door was introduced into evidence. It was addressed to "Whit and Arin" and was signed off by "Dad." It expressed "frustrations of life in general" and stated that "I can't fix things that are unfixable. I love you both, but if there is a basement in hell, I can assure you that your mother will be firing the furnace!!" The note concluded, "I really haven't planned for this but . . . things will work out."

During Arin Johnson's direct testimony as a defense witness, she mentioned that her father had been sleeping on the lower floor "since the assault charge." Before cross-examination, the trial court conducted a jury-out hearing to rule on the state's request to be allowed to ask the witness about the assault charge. The trial court granted the state's request, and upon cross-examination, Arin Johnson testified that in May 1995 the defendant had been charged with assault against the victim. She testified that the defendant returned from jail, apologized to the family, told them it would not happen again, and then told Arin that he would kill her mother before he would go back to jail. Furthermore, Arin Johnson testified that her parents mutually drank and argued and that sometimes Arin had to physically intervene. The defendant continued to drink in front of the victim after

5

she had undergone rehabilitation programs and sometimes offered alcoholic beverages to the victim. Arin Johnson stated that, on the day of her mother's death, she had planned to take her mother out of the house for her safety but that the victim was in no condition to leave. On redirect examination, Arin Johnson said that the defendant had stopped talking to the daughters. "If mom was sober, then everything was fine, and if it wasn't, nobody said anything to each other." She said that as the victim's drinking got worse, the defendant's did also.

During Whitney Johnson's direct testimony as a defense witness, she stated that before the shooting the defendant was in "a rage that I have never seen before in my life." Before the state's cross-examination, the trial court held a jury-out hearing to determine the admissibility of evidence of prior acts of domestic violence that were "a part of this family," to show that the defendant's rage prior to the shooting was not unprecedented. The trial court granted the state's request, and upon cross-examination before the jury, Whitney Johnson testified that she had previously seen the defendant in a similar rage. On that occasion, the defendant had assaulted the victim, and Arin Johnson had placed the victim in Arin's car and was about to drive her to the hospital. The defendant attacked the car with a sledge hammer and broke out the car windows with Arin and her mother seated inside.

At trial, the defense conceded that the defendant shot and killed the victim but argued that the defendant was incapable of premeditation and/or deliberation. The defendant did not testify. The jury convicted him of first degree murder, and because the state had filed no notice of intent to seek the death penalty, the trial court imposed a life sentence without holding a sentencing hearing.

## I. Sufficiency of the Evidence.

In the defendant's first issue, he challenges the sufficiency of the evidence to support findings of premeditation and deliberation, necessary elements

of first degree murder.

When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record, as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. Id. In State v. Grace, 493 S.W.2d 474 (Tenn. 1973), our supreme court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state." Grace, 493 S.W.2d at 476.

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.

7

1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. Id.

The defendant was convicted pursuant to Tennessee Code Annotated section 39-13-202(a)(1) (1991) (amended 1995) which defined first degree murder as an "intentional, premeditated and deliberate killing of another . . . ." In 1995, the legislature amended this statute by deleting the requirement that the killing be deliberate. 1995 Tenn. Pub. Acts, Ch. 460, § 1. The amendment was effective July 1, 1995, nine days after the killing of the victim in the present case.

A homicide, once established, is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The state then has the burden of proving the elements of premeditation and deliberation in order to elevate the homicide to first degree murder. Id.

A premeditated act is "one done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-201(b)(2) (1991) (amended 1995). "'Premeditation involves a previously formed design, or actual *intention* to kill.'" Brown, 836 S.W.2d at 539 (quoting Lewis v. State, 40 Tenn. 127, 147-48 (1859)) (italics added in Brown). It is the process "'of thinking about a proposed killing before engaging in the homicidal conduct.'" Id. at 541. "[N]o specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan . . ." Id. at 543.

The pre-1995 statute also required that "the premeditated killing must also have been done deliberately, that is, with coolness and reflection." Brown, 836 S.W.2d at 539. A deliberate act is "one performed with a cool purpose." Tenn. Code Ann. § 39-13-201(b)(1) (1991) (amended 1995). The cool purpose must be

formed "in the absence of passion," or if formed in passion, it must be committed "after the passion has subsided." State v. Bullington, 532 S.W.2d 556, 559 (Tenn. 1976). "[D]eliberation requires some period of reflection, during which the mind is 'free from the influence of excitement, or passion.'" Brown, 836 S.W.2d at 540. It is the process of weighing the wisdom of proceeding with the plan, the manner of carrying out the killing, and the consequences which may result. Id. at 541. Deliberation requires "'a cool mind that is capable of reflection.'" Id. It cannot be formed instantaneously. State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); State v. Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995).

Premeditation and deliberation are separate and distinct elements, and the state is required to prove both in order to establish first degree murder. See Brown, 836 S.W.2d at 542-43; West, 844 S.W.2d at 147. These elements present questions for the jury to decide. State v. Gentry, 881 S.W.2d 1, 3 (Tenn. Crim. App. 1993). However, because these elements entail proof of a state of mind about which there may be no direct evidence, "the cases have long recognized that the necessary elements of first-degree murder may be shown by circumstantial evidence." Brown, 836 S.W.2d at 541; see also Bullington, 532 S.W.2d at 560; State v. Carter, 970 S.W.2d 509, 516 (Tenn. Crim. App. 1997). Thus, premeditation and deliberation may be inferred from the circumstances surrounding the killing. Gentry, 881 S.W.2d at 3. For instance, facts which might allow a jury to infer either premeditation or deliberation include:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is planning activity;
> (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and
> (3) facts about the nature of the killing from which it may be inferred that the manner of the killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). In particular, Tennessee courts have identified some relevant circumstances:

> the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declaration by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing

9

the crime.

State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997), cert. denied, ---- U.S. ---, 118 S.Ct. 1536 (1998).

We have reviewed a number of cases in which the defendants have challenged the sufficiency of the elements of premeditation and/or deliberation. In cases in which the appellate courts have affirmed the conviction of first degree murder, the defendant typically procured a weapon for the purpose of killing the victim. See, e.g., State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997), cert. denied, --- U.S. ---, 118 S.Ct. 376 (1997); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996); State v. Bullington, 532 S.W.2d 556, 558 (Tenn. 1976); State v. Sharon Leming, No. 01C01-9704-CC-00151, slip op. at 10 (Tenn. Crim. App., Nashville, Oct. 9, 1998); State v. Steven Tolbert, No. 03C01-9707-CR-00325, slip op. at 4, (Tenn. Crim. App., Knoxville, Oct. 7, 1998), perm. app. denied (Tenn. 1999); State v. Calvin Lee Sneed, No. 03C01-9611-CR-00444, slip op. at 11 (Tenn. Crim. App., Knoxville, Jun. 12, 1998); State v. Glenn Bernard Mann, No. 02C01-9502-CC-00046, slip op. at 6 (Tenn. Crim. App., Jackson, Aug. 16, 1996), aff'd, 959 S.W.2d 503 (Tenn. 1998), cert. denied, --- U.S. ---, 118 S.Ct. 2376 (1998); State v. Kendricks, 947 S.W.2d 875, 880 (Tenn. Crim. App. 1996); see also State v. Fugate, 776 S.W.2d 541, 545 (Tenn. Crim. App. 1988). In many of these cases, a history of strife between parties was present and/or an argument or confrontation immediately preceded the fatal assault. Sharon Leming, slip op. at 5; Kendricks, 947 S.W.2d at 880; Fugate, 776 S.W.2d at 545.

Of the examined cases in which the appellate courts reversed the first degree murder conviction because premeditation or deliberation was not established, there was typically no procurement of a weapon for the purpose of killing the victim. West, 884 S.W.2d at 148; Brown, 836 S.W.2d at 543; State v. Donald Wallace, No. 01C01-9711-CC- 00526, slip op. at 10 (Tenn. Crim. App., Nashville, Sept. 30, 1998); State v. Schafer, 973 S.W.2d 269, 273 (Tenn. Crim.

10

App. 1997); State v. Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995); State v. Bordis, 905 S.W.2d 214 (Tenn. Crim. App. 1995); cf. State v. Boyd, 909 S.W.2d 50, 55 (Tenn. Crim. App. 1995) (insufficient proof of premeditation and deliberation where defendant "reached her boiling point" with the victim's sexual harrassment of her and went to her car to retrieve gun before shooting, but not killing, the victim). These cases tend to follow one of two patterns -- either there was no proof of any facts from which mental state could be inferred, or the proof established that the defendant was incapable of either premeditation or deliberation or both.

With the foregoing principles and guidelines in mind, we have carefully reviewed the evidence of the defendant's state of mind in the light most favorable to the state. This evidence is of three types: (1) the evidence of the defendant's prior statement about killing the victim before he would return to jail; (2) the note authored by the defendant; and (3) Fields's testimony about the crucial minutes before the shooting.

Fields's testimony differs from -- or at least is more specific than -- Whitney Johnson's testimony. According to Fields, the defendant threatened to kill the victim during his first visit to the bedroom that evening. The defendant said he would not allow the victim to get his money and that he was through living the way he was living. The defendant then descended both levels to retrieve the gun and the shells from the gun cabinet. He told Fields, "I was going to kill that bitch," and he continued "rambling" over and over again that Mrs. Johnson was not going to get his money and that he would kill her. When Fields tried to intervene, the defendant threatened him and ordered him out of the way. Fields followed the defendant to the second floor where the kitchen is located but did not follow the defendant to the third floor to the victim's bedroom. As the defendant climbed the last stair flight, he again repeated that he intended to kill the victim. Fields could see up through the atrium space onto the balcony and partially through the bedroom door. He could see the defendant and the upper portion of the victim's body. He saw the defendant

11

pull the victim off the bed onto the floor. The defendant pointed the shotgun at her and told her that he was going to kill her. Fields tried to dissuade the defendant by telling him in a loud voice that he had "two wonderful daughters to live for . . . it wasn't worth going to jail. A divorce would be easier. Everything I could think of." Fields testified that the defendant, while standing on the balcony, "would look back at me." The defendant said, in Fields's words, that the defendant "had to do what he had to do, that his daughters would be taken care of." Fields made numerous pleas, and the defendant would go "backwards and forwards," away from the bedroom and then back inside. Five minutes elapsed during Fields's pleas and the defendant's movements in and out of the bedroom. At some point, Fields realized that the defendant "had a look in his eyes, and . . . I knew he was going to do it." As Fields started to turn away, the defendant shot the victim. He ran down the stairs, asked Fields where his shotgun shells were, and stated, "I killed her."

On appeal, both sides present plausible, formidable arguments. To be sure, the question of whether deliberation, in particular, was established beyond a reasonable doubt is a close one. However, we hold that the defendant has not carried his appellate burden and that, in the light most favorable to the state, the evidence provides bases upon which the jury could infer that the defendant deliberated by weighing the wisdom and the consequences of the homicide that he clearly intended. Certainly, the defendant was emotional, but a cool purpose "is not synonymous with a complete absence of emotion." State v. Nathan Allen Callahan, No. 03C01-9507-CC-00203, slip op. at 12 (Tenn. Crim. App., Knoxville, Apr. 24, 1997), aff'd, 979 S.W.2d 577 (Tenn. 1998). The act was not performed instantaneously after he became climatically enraged. Two people--one of them the defendant's daughter--tried to intervene and desperately pleaded with the defendant to reconsider. During a five-minute interlude, the defendant appears to have pondered the murder of his wife. Perhaps no one will ever know the defendant's true state of mind at the time he pulled the trigger. All we can require is that the state prove sufficient circumstances from which the jury can infer that the defendant

12

premeditated and deliberated the murder beyond a reasonable doubt. In the present case, the state met this burden. The evidence is sufficient to support the conviction of first-degree murder.

## II

The defendant challenges the trial court's jury-out determinations which led to the state eliciting testimony from defense witnesses on cross-examination that the defendant (1) smashed windows in a car while the victim was seated inside, (2) committed an assault against the victim for which she obtained a warrant, and (3) said he would kill the victim before he would return to jail. The record is somewhat confusing as to the purpose of this evidence. The record of the trial court's charge conference reflects that defense counsel thought that the cross-examination was allowed in order to impeach the witnesses by contradicting their direct examination testimony. Although the trial court instructed the jury that the use of the testimony about the two assault incidents was limited to its effect on the credibility of the witnesses Arin and Whitney Johnson, the prior threat against the victim was used as substantive evidence.

The scope of cross-examination includes "any matter relevant to any issue in the case, including credibility," except that the scope is limited to the subject matter of the direct examination when the witness is an adverse party of the proponent. Tenn. R. Evid. 611(b). With this rule as a guide, the control of cross-examination is entrusted to the sound discretion of the trial court. See State v. Gaylor, 862 S.W.2d 546 (Tenn. Crim. App. 1992).

## (A)

First, we examine the cross-examination of Arin Johnson in which she testified that, after going to jail on an assault charge, the defendant said he would kill the victim before he would go to jail again. The trial court stated that such evidence was admissible as substantive evidence and did not include this evidence

13

in the instruction on impeachment of witnesses.

In a homicide prosecution, prior threats made by the defendant against the victim are admissible to show premeditation, intent, or the state of mind of the accused. State v. Ray, 880 S.W.2d 700, 704 (Tenn. Crim. App. 1993); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981); Hull v. State, 553 S.W.2d 90, 93 (Tenn. Crim. App. 1977). The probative value of such evidence is high, especially in a case such as the present case where the threat was recently made and the defendant at trial challenged the presence of premeditation and deliberation. We conclude that the prior threat evidence was admissible.

(B)

The trial court instructed the jury that the purpose of the evidence about the May 1995 assault against the victim and the earlier incident of breaking the car windows was to "give . . . an explanation of the witness[es'] testimony and to test the strength or weakness of any witnesses' testimony." The court cautioned the jury that such evidence could not be used to reflect upon the "defendant's character or action in conformity with character or trait," and the court gave a general charge on impeaching the credibility of witnesses. The court instructed the jury that "a witness may be impeached by a careful cross-examination, involving the witness in contradictory, unreasonable and improbable statements."

"The credibility of a witness may be attacked by any party . . . . "Tenn. R. Evid. 607. Though not specifically mentioned in the Rules of Evidence, impeachment by fact contradiction is well-accepted. Neil P. Cohen et al., Tennessee Law of Evidence § 607.3, at 338 (3d ed. 1995) ("The general rule is that counsel can challenge the accuracy of any relevant facts during cross-examination.")

14

The defendant's guilt of a May 1995 assault is suggested by Arin Johnson's testimony that he apologized and told the family it would not happen again. This testimony was in response to the prosecutor's question about Ms. Johnson's direct examination statement that the defendant had been sleeping downstairs since "the assault charges." This direct testimony was equivocal and invited exploration. The witness did not specify whether the victim had charged the defendant or *vice versa*. The defense put "the assault charges" at issue. See State v. Jones, 215 Tenn. 206, 217, 385 S.W.2d 80, 84-85 (1964) (defendant putting record at issue by testifying on direct examination that he had never been indicted or convicted provided basis for admitting cross-examination about a prior "whisky violation"). Moreover, the elicited evidence was arguably admissible through the state's case-in-chief as substantive evidence. Glebock, 616 S.W.2d at 905-06 ("The relations existing between the victim [of a violent assault] and the defendant prior to the commission of the crime are relevant. These relations indicate hostility toward the victim and a settled purpose to harm the victim."). Certainly, the cross-examination testimony was admissible for impeachment purposes.

The evidence of the car-window breaking episode was also admissible through cross-examination. Whitney Johnson had testified that on the day of the homicide the defendant was in a rage that she had never seen before. On cross-examination, she admitted that prior to June 21, 1995, she had seen him in such a rage when he attacked Arin Johnson's car with the sledge hammer while Arin and the victim were seated inside the car. Clearly, this was fact-contradiction impeachment at work. See Lang v. State, 3 Tenn. Crim. App. 108, ---, 457 S.W.2d 882, 885 (1970). There was no error in allowing the cross-examination.

We realize that in both instances the evidence elicited on cross-examination impugns the defendant by implicating him in prior bad acts. See Tenn. R. Evid. 404(b); 608(b). However, the trial court held jury-out hearings in both instances, see Tenn. R. Evid. 404(b)(1); 608(b)(1), and gave the jury limiting

15

instructions both as to the use of character evidence and the limited purpose of impeachment. These precautions employed by the trial court are sufficient to protect the defendant against any incidental "bad acts" effect of impeachment through fact contradiction.

III

In the defendant's next issue, he challenges the trial court's jury instruction concerning the defendant's eligibility for parole should he be convicted of any of the various grades of homicide. The instruction was given at the state's request and was based upon Tennessee Code Annotated section 40-35-201(b) (1997) (amended 1998), as said Code section existed at the time of the trial in this case.[2] Paragraph (b)(1) of this section authorized the trial court in non-capital cases, upon request by either party, to instruct the jury on the "possible penalties for the offense charged and all lesser included offenses." Once the request is made, the trial court is required by paragraph (b)(2) to also instruct "the jury to weigh and consider the meaning of a sentence of imprisonment," to provide "an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date," and to inform the jury about section 41-21-236 maximum and minimum sentence reduction credits and the governor's power to reduce prison overcrowding, where applicable. Tenn. Code Ann. § 40-35-201(b)(1), (2) (1997) (amended 1998). Paragraph (b)(2) was added to the statute in 1994. 1994 Tenn. Pub. Acts, ch. 847, §3. Prior to this amendment either party could request the "possible penalties."

---

[2] For all trials occurring after May 18, 1998, "the judge shall <u>not</u> instruct the jury, nor shall the attorneys be permitted to comment at any time to the jury, on possible penalties for the offense charged nor all lesser included offenses." 1998 Tenn. Pub. Acts ch. 1041, § 2, (amending Tenn. Code Ann. § 40-35-201(b)) (emphasis added). The trial in the present case occurred May 12-14, 1997.

16

In the present case, the trial court held a charge conference with counsel after the defense rested its case. In the conference, the state mentioned its request to charge the jury pursuant to Code section 40-35-201, as it existed at that time. The trial judge indicated he would charge the ranges of the offenses but would not give the jury the paragraph b(2) information. Defense counsel originally objected to any charge on penalties. When the trial judge said he would give the release eligibly time for a life sentence and would give the Range I minimum and maximum sentences for the lesser included offenses, defense counsel said there was "no reason to complicate it anymore than what it is." The defense agreed to limiting the charge to the range information as proposed by the court as a Hobson's choice between a limited charge and one that contained the formula information. Specifically, the defendant did not waive its underlying objection to giving any charge.

The trial court then proceeded to instruct the jury that, although it would not attempt to fix any punishment, it could "weigh and consider the meaning of a sentence of imprisonment." The trial court then proceeded to inform the jury that (1) if the defendant were convicted of first degree murder, he would receive a life sentence and would be eligible for parole consideration after serving 25 years; (2) if convicted of second degree murder, the defendant's sentence would be set in a range between fifteen and 25 years; (3) if convicted of voluntary manslaughter, the defendant's sentence would be set within a range between three and six years; (4) similarly, a range of between two and four years applied to reckless homicide; and (5) a range of between one and two years applied to criminally negligent homicide. The judge instructed the jury with respect to each offense that actual release at a release eligibility date is a discretionary decision of the Board of Paroles and that the Board has the authority to require the service of the entire court-imposed sentence.

The defendant challenges the constitutionality of Code section 40-35-

17

201(b) as it existed at the time of trial. The state argues first that the defendant has waived any objection by agreeing to the "hybrid" charge. The state also argues the issue is settled by the supreme court's decision in State v. King, 973 S.W.2d 586 (Tenn. 1997).

We agree that the defendant may have waived any claim that the "hybrid" charge is a violation of Code section 40-35-201(b), but as noted above, the defendant did not waive any claim that the statute or the given charge contravenes the state or federal constitutions. At the defendant's insistence, the trial court specifically acknowledged when it elicited the agreement on giving the hybrid charge that the defendant was not waiving his "Farris claim." See State v Farris, 535 S.W.2d 608 (Tenn. 1976 ) (sustaining a constitutional challenge to former Tennessee Code Annotated section 40-2707(1975), which mandated parole eligibility instructions, based upon the enactment being broader than its caption, see Tenn. const. art. II, § 7, with two members of the court finding that the enactment was unconstitutionally vague, Farris, 535 S.W.2d at 612-13). Therefore, we proceed to the heart of the issue--whether the charge given violated pertinent constitutional provisions.

In King, the defendant requested an instruction on the "possible penalties" as contemplated by Code section 40-35-201(b)(1), but he asked the trial court "to refrain from instructing the jury on parole eligibility, as required by Tenn. Code Ann. § 40-35-201(b)(2) whenever an instruction is given under (b)(1)." King, 973 S.W.2d at 587. The trial court, however, gave the full instruction as described in both paragraphs (b)(1) and (2). On appeal, King claimed that paragraph (b)(2) and the instruction given thereunder violated both the state constitutional separation of powers provisions, Tenn. const. art. II, §§ 1, 2, and the state and federal constitutional due process provisions. U.S. const. amend 14, § 1; Tenn. const. art. I, § 8. The court held that the instruction as given in King offended no constitutional provisions. It must be recognized, however, that in King (1) the trial court instructed

18

the jury as to a range between the shortest possible sentence (Range I) and the longest possible sentence (Range III), and (2) the trial court instructed the jury that the sentencing information was "for your information only" and disdained the "weigh and consider" formulation of paragraph (b)(2). King, 973 S.W.2d at 592.

In the present case, the trial court instructed the jury that it would not be determining the sentence, but in giving range information, the trial court used the "weigh and consider" phrase. Despite this distinction between King and the present case, we hold that the instruction given violated no constitutional provision.

First, we examine the trial court's limiting the "possible penalties" information to Range I. Although the trial court in the present case did not charge the longer punishments that accompany sentencing in Ranges II (multiple offender) and III (persistent offender), there was no realistic possibility that the defendant would be sentenced in any range higher than Range I (standard offender). In King, the supreme court approved of this court's pronouncement in State v. Smith, 926 S.W.2d 267, 271 (Tenn. Crim. App. 1995), that the jury was properly charged on the full scope of the sentencing range running from the minimum in Range I to the maximum in Range II, the highest sentence for which Smith was eligible. King, 973 S.W.2d at 591. The jury was properly instructed when it "'was aware of the possible range of punishment that could have resulted from their verdict.'" Id. (quoting Smith, 926 S.W.2d at 271). Likewise, the jury was properly instructed in the present case even though the higher punishments in Ranges II and III were not charged. The jury was given the "possible range of punishment that could have resulted from their verdict." Id.

We now examine the effect of the charge given in the present case, including the effect of the trial court's use of the "weigh and consider" statutory language instead of the "information only" language actually used in King.

In State v. Jason M. Weiskopf, No. 02C01-9611-CR-00381 (Tenn. Crim. App., Jackson, Feb. 4, 1998) (Weiskopf I), a panel of this court found constitutional error in the use of a paragraph (b)(2) jury instruction that used the "weigh and consider" language. Our supreme court, granted Weiskopf's application for permission to appeal for the purpose of remanding the case to this court "for reconsideration in light of" King. State v. Jason M. Weiskopf (Tenn., Jackson, Nov. 2, 1998) (per curiam order). Upon reconsideration, this court held that the "weigh and consider" mandate given to the jury distinguished Weiskopf from King. State v. Jason M. Weiskopf, No. 02C01-9611-CR-00381, slip op. at 5 (Tenn. Crim. App., Jackson, Dec. 4, 1998) (Weiskopf II), pet. for perm. app. filed (Tenn., Feb. 3, 1999).

The Weiskopf II court interpreted the due process determination in King to be limited to cases in which the "for information only" language was used, based upon the supreme court's statement that no due process violation occurred "under the circumstances." King, 973 S.W.2d at 592. The Weiskopf II court concluded "[t]here is a glaring and pivotal difference" in using one locution versus the other. Weiskopf II, slip op. at 5. In Weiskopf, a first degree murder case, the jury was instructed "that the earliest release eligibility date for first degree murder was 25 years; the earliest release eligibility date for second degree murder was 1.06 years; and the earliest release eligibility date for voluntary manslaughter was .21 years." Weiskopf II, slip op. at 4. This court said, "When a jury is told to 'weigh and consider' the meaning of a sentence in arriving at a verdict, the nature of the problem is perfectly obvious." Weiskopf II, slip op. at 6. The court held that the instruction given violated the due process provisions of both the federal and state constitutions. Id.

Although the trial court in the present case told the jury to weigh and consider the penalty information the court imparted, that information was limited to the paragraph (b)(1) information, with the exception that the trial court stated that the release eligibility date for first degree murder was 25 years. With this

20

exception, none of the paragraph (b)(2) information was given. We conclude that, just as Weiskopf was distinguishable from King, the present case is distinguishable from Weiskopf. The charge in the present case contained none of the paragraph (b)(2) information that would disparage the selection of lesser included offenses. We hold that, under the circumstances of the present case, the general rationale of King controls. The defendant has failed to establish that any constitutional principles invalidate the procedures used in the present case.

III

In his final issue, the defendant complains about the trial court's refusal to give to the jury the defendant's requested charge on the meaning of "passion." The requested charge says:

> (a) In order for a killing to constitute murder in the first degree, the killing must be performed with a cool purpose, and the cool purpose must be formed and the deliberate intention conceived in the mind of the accused, in the absence of passion, to take the life of the person slain.

> (b) "Passion" means any of the human emotions known as anger, rage, sudden resentment or fervor which renders the mind incapable of cool reflection.

The trial court acknowledged that the requested language was extracted from State v. Bullington, 532 S.W.2d 556 (Tenn. 1976); however, the court stated that the Tennessee Pattern Instruction charge would be sufficient. The trial court charged the jury as follows:

> For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> . . .
>
> (3) that the killing was deliberate. A deliberate killing is one done -- one performed with cool purpose; . . . .
>
> . . .
>
> The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation. If the design to kill was formed with deliberation and premeditation, it is immaterial that the accused may

21

have been in a state of passion or excitement when the design was carried into effect. Furthermore, premeditation can be found if the decision to kill is first formed during the heat of passion, but the accused commits the act after the passion has subsided.

The defendant is entitled to a complete and correct charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), including the law governing the issues raised by the evidence. State v. Zirkle, 910 S.W.2d 874, 892 (Tenn. Crim. App 1995). A court commits no error by refusing a special charge if the instructions given impart a correct, full and fair statement of the applicable law. Id.

In the present case, the trial court adequately instructed the jury on the meaning of the applicable elements of first degree murder. The charge as given explained the role of passion on the issue of deliberation. There was no need to augment the court's instruction with language that explained the common term "passion." See State v. Bennett, 798 S.W.2d 783, 790 (Tenn. Crim. App. 1990).

V

In conclusion, we find no reversible error and affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., Judge


CONCUR:



_____
DAVID G. HAYES, Judge



_____
JERRY L. SMITH, Judge

22