IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 23, 2003 Session

## STATE OF TENNESSEE v. MICHAEL LENARD HALL

**Appeal from the Criminal Court for Knox County**
**No. 67234    Mary Beth Leibowtiz, Judge**

---

**No. E2002-01834-CCA-R3-CD**
**March 11, 2004**

---

Michael Lenard Hall appeals from his Knox County Criminal Court conviction of first degree murder of his ex-wife, Pamela Hall. He claims that insufficient evidence supports his conviction, that the jury instructions were flawed, and that the prosecution denied him a fair trial through improper questioning of witnesses and improper argument. Because we agree with the defendant that the state failed to present sufficient proof of premeditation, we modify the first degree murder conviction and impose a second degree murder conviction in its place. However, we are unpersuaded of error warranting a new trial. We remand for sentencing on the second degree murder conviction.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Modified and Remanded.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Tommy K. Hindman, Knoxville, Tennessee (at trial); Mark Stephens, Public Defender, Knoxville, Tennessee (at trial); and Wade V. Davies, Knoxville, Tennessee (on appeal), for the Appellant, Michael Lenard Hall.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Jo Helm, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The defendant does not dispute that Pamela Hall suffered a brutal and grisly death. Ms. Hall was beaten to death in her own home. She died lying in a pool of her own blood, which was also smeared and spattered throughout the apartment in which she lived. The state theorized at trial that the defendant, distraught over the victim's rejection of him, killed her in an encounter on the afternoon of September 11, 1998. The defendant admitted that he had been to the victim's home that afternoon, but he claimed that he had not seen her there and that he did not kill her.

The state's case-in-chief established that the authorities were summoned to the victim's apartment home shortly after noon on September 12, 1998. The victim's body was on the floor, and there was blood on almost every surface in the room.

Doctor Sandra Elkins, the Knox County Medical Examiner, testified that the victim's death was caused by blunt force head injuries. Doctor Elkins opined that the victim had been dead for approximately 24 hours prior to her examination of the body on September 12, 1998 at 4:00 p.m. The victim had injuries on her arms that were consistent with defensive wounds, and she had injuries on her hands that were consistent with either offensive or defensive wounds. Doctor Elkins concluded after a visit to the scene that a struggle lasting at least one to two minutes had occurred prior to the victim being rendered unconscious and that the victim had been alive for two to six hours after the fatal blow was delivered to the back of the head.

Mary Booth, the manager of the apartment building in which the victim lived, testified that the defendant came to her door on September 12 with his son in his arms. He said that Pam had been hurt. The defendant was calm and was not crying. Mrs. Booth's husband went to check on the victim, and returned and told Mrs. Booth to call 911. During the time that the defendant was in Mrs. Booth's home, he said something like, "Oh God. God help her over the River Jordan."

Several items of physical evidence linked the defendant to the crime scene. Broken glass was found around the room in which the victim's body was discovered, and the glass was determined to have come from a broken globe from a chandelier that was hanging above the victim's body. On one of the pieces of glass, a fingerprint matching that of the defendant was identified. In addition, DNA evidence matching the victim's profile was present on a watch recovered from the defendant's car and a boot recovered from the home in which the defendant was living at the time of the victim's death.

Gloria King, with whom the defendant was living at the time of the victim's death, testified that the defendant was not at her house for several hours on the afternoon of September 11, 1998. He left around 1:00, and he returned at approximately 4:20. He was wearing the same clothing when he returned late that afternoon as he had been wearing when he departed earlier, and he and his toddler son were sweaty and red-faced as if they had been playing. Later that evening, the defendant burned some trash, which was not unusual, as there was no garbage collection at the residence. Ms. King heard the defendant come inside the house that night sometime after she retired to bed at 9:00 or 9:30, and she claimed that had he left during the night, she would have heard him. Ms. King testified that she recalled making an earlier statement to a detective that it was not unusual for the defendant to get up early in the morning to go look for the victim. Ms. King also recalled that the defendant had accused the victim of having sexual relations with other men and that he had been experiencing financial difficulties and was at odds with the victim over the issue of child support.

Carol Bounds, the victim's mother, testified that the defendant had been at her house at 5:45 a.m. a few days before the victim was killed. He struck up a conversation with Ms. Bounds,

during which he expressed disapproval of the victim's parenting style and suggested that Ms. Bounds check the victim's handbag for condoms. Ms. Bounds claimed that the defendant told her, "Pam and [the defendant's child with the victim] is the same as dead to me."

One of the owners of the car dealership from which the victim's car was purchased testified that the defendant came to the dealership from time to time to make car payments on the victim's behalf. The defendant was there for that purpose on the afternoon of September 11, 1998 at 2:00 or 2:30. She identified the receipt found in the victim's pants pocket as the one she issued to the defendant on that date. She described the clothing that the defendant was wearing, and that description was at odds with the clothing that Gloria King described the defendant as wearing on that afternoon.

Investigator Mike Grissom of the Knox County Sheriff's Department testified that he had responded to the scene on September 12. He spoke with the defendant at length. The defendant told Investigator Grissom that he had been to the victim's apartment on the afternoon of September 11 to talk the victim, but she was not home. He left a plastic bag with diapers and some children's clothing between the screen and inner doors of the apartment. The defendant did not mention leaving a receipt for the victim's car payment inside the bag. The defendant detailed his activities of September 11 for Investigator Grissom, but he did not mention having made the victim's car payment for her. The defendant claimed that he had come to the victim's apartment on the morning of September 12. After knocking and receiving no response, he noticed that the door was cracked and went inside. He saw the victim on the floor, checked her pulse, and then stepped over her and went to the sink to wash his hands. He saw some car keys in the sink, which he retrieved. He placed a blanket over the victim's body. As he left, he tossed the keys he had found in the sink onto a washing machine that was near the front door. The defendant did not explain why he had moved the keys. The defendant claimed that he still loved the victim. He said that he had been intimate with the victim earlier in the week that she had been killed, and he claimed that he was only afforded this opportunity when he made her car payment for her.

In his case-in-chief, the defendant presented evidence calculated to contradict the state's proof that he was the victim's killer.

The owner of a neighborhood grocery store testified that the defendant and his toddler son had been in the store at approximately 3:00 on the afternoon of September 11.

Samuel Murphy testified that he had been to the victim's home a few weeks prior to her death. However, the victim had not been home. He claimed that he had not returned to her home thereafter. Mr. Murphy acknowledged that he had been drinking on September 11, 1998, and he had been told that he attempted to commit suicide that evening, although he had no personal recollection of having done so. He admitted that he had not reported to work on September 12, but he claimed he was a patient at "Lakeshore" at the time. He admitted that he had a broken blood vessel in his eye when he returned to work the following week.

The defendant testified that he left Gloria King's house around noon or 1:00 p.m. on September 11. After making two stops, he went to make the victim's car payment. He denied that he changed clothes that afternoon before returning to Ms. King's home. He admitted that he sometimes went to check on the victim early in the morning, and he attributed this activity to their young son's desire to see his mother.

The defendant admitted that he had been to the victim's apartment the afternoon of September 11, and he claimed that he left a plastic bag with diapers, children's clothing, and a receipt for the victim's car payment there. After leaving the victim's home, he and his son went to a grocery store, a gas station, and then returned to Ms. King's home at 4:20 p.m. or 4:25 p.m. Later that evening, the defendant burned some trash, which he claimed he did three or four times a week.

The defendant testified that he returned to the victim's apartment in the early afternoon of September 12. The victim did not open the door when the defendant knocked. The door was ajar, and the defendant went inside. He discovered the victim's body, attempted to check her pulse, and found that she was cold. He became distraught, covered the victim's body with a blanket, stepped over her body, and washed his hands in the sink. He noticed some keys in the sink and a watch belonging to his and the victim's son on the counter. He took the keys and the watch, stepped back over the victim's body, and headed for the door. As he was leaving, he threw the keys onto the washer or dryer. The defendant said he was not sure why he had picked up the keys.

The defendant claimed that he still loved the victim at the time of her death and denied that he had killed her. In an attempt to explain why her blood was on his boots, he claimed that the victim had cut her finger a few weeks before her death while he was helping her move her washer and dryer, and she had slung her finger so that blood flew onto him.

The defendant denied that he had told the victim's mother to check the victim's purse for condoms. He likewise denied that he had told the victim's mother that the victim and their son were as good as dead to him.

The defendant claimed that he had told Investigator Grissom about having taken his son's watch from the victim's apartment. He testified that he told Investigator Grissom this during a taped conversation, but the tape had been damaged.

After receiving the evidence, the jury found the defendant guilty of first degree murder. The defendant then perfected this appeal.

## I

The defendant raises two challenges to the sufficiency of the convicting evidence. He claims that the state failed to prove that the victim's murder was premeditated and that the defendant was the perpetrator of the crime. We will consider both issues in turn.

-4-

The standard of review for sufficiency claims is a familiar one. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 8 (Tenn. 2000).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id*. at 835. In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said, "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id*. at 914.

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 484, 470 S.W.2d at 613.

We consider first the defendant's claim that he was improperly convicted of first degree murder because the state failed to prove that the crime was premeditated. First degree murder, as relevant here, is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003). "'[P]remeditation' is an act done after the exercise of reflection and judgment." *Id*. § 39-13-202(d) (2003). The defendant claims that the state's proof was insufficient

to overcome the presumption that the crime was second degree murder. *See State v. Gentry*, 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993) (once homicide established, it is presumed to be second degree murder).

Proof of premeditation is inherently circumstantial. The trier of fact cannot speculate what was in the killer's mind, so the existence of premeditation must be determined from the defendant's conduct in light of the circumstances surrounding the crime. *See State v. Johnny Wright*, No. 01C01-9503-CC-00093 (Tenn. Crim. App., Nashville, Jan. 5, 1996). Thus, in evaluating the sufficiency of proof of premeditation, the appellate court may look to the circumstances surrounding the killing. *See, e.g., State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Coulter*, 67 S.W.3d 3, 72 (Tenn. Crim. App. 2001). Such circumstances may include "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660. Although the infliction of multiple blows to the victim is not alone sufficient to establish premeditation, *see State v. Brown*, 836 S.W.2d 530, 541-43 (Tenn. 1992), repeated blows that evidence the particularly brutal nature of the killing are supportive of a jury's finding of premeditation, *see State v. Sims*, 45 S.W.3d 1, 8 (Tenn. 2001).

Pamela Hall suffered an attack by an armed perpetrator; there is no evidence to indicate whether she was likewise armed. The killing was a brutal bludgeoning. A few days before the homicide, the defendant made a statement to the victim's mother that the victim and their child were "the same as dead" to him. There is no evidence to demonstrate that the defendant procured a weapon or made prior preparations to conceal the crime. The evidence regarding the defendant's demeanor in the late afternoon and evening of September 11, 1998 is not remarkable. Given the scant evidence from which premeditation may be inferred, we hold that the evidence cannot sustain a conviction of premeditated first degree murder. *See State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992) (jury may reject defendant's version of events but may not accredit a theory that is does not have an evidentiary basis); *State v. Donald Wallace*, No. 01C01-9711-CC-00526 (Tenn. Crim. App., Nashville, Sept. 30, 1998) (proof of premeditation insufficient where evidence demonstrated that defendant's procurement of weapon was not to use against victim, proof showed that victim was fearful of defendant, and evidence showed that defendant made efforts to conceal crime afterwards).

This conclusion is buttressed by the position the state itself took at trial. The state theorized that the defendant went to the victim's house with the expectation of receiving sexual favors for having made the victim's car payment for her, as was consistent with their usual custom. However, according to the state's theory, the agreement went awry that day, and the defendant responded by beating the victim with an unidentified object, thereby killing her. Even if the state's postulation is accredited, it does not foster a conclusion that a premeditated murder occurred. The state's own theory is itself more consistent with a knowing killing or unpremeditated, intentional killing, that is, second degree murder. Accordingly, the defendant's conviction of first degree murder must be modified to the lesser offense of second degree murder.

-6-

The defendant also challenges the sufficiency of the jury's finding that the defendant was the perpetrator of the crime. On this point, we hold that the evidence was sufficient. The defendant admitted that he had stopped by the victim's apartment on the afternoon of September 11, 1998, although he claimed that she had not been home. Prior to going to the victim's apartment on that date, the defendant made the victim's car payment and obtained a receipt, and that receipt was recovered from the victim's pocket after her demise. DNA evidence which matched the victim's profile was identified from samples from the defendant's boots that were recovered from his room at Gloria King's house and from a watch that was inside the car the defendant was driving on the day after the victim's death. A fingerprint matching that of the defendant was found on a broken globe from a chandelier hanging above the location where the victim's body was found. Although the defendant offered ostensibly innocuous explanations for the presence of the victim's blood on his property and his fingerprint on the broken globe from the victim's home, we must consider the evidence in the light most favorable to the state at this juncture. In so doing, we conclude that these evidentiary items point the finger of guilt at the defendant. Therefore, the state's proof sufficiently supports a conclusion that the defendant was the perpetrator of the crime.

Having found insufficient proof of premeditation, we modify the defendant's first degree murder conviction to one of second degree murder.

**II**

The defendant challenges two aspects of the trial court's instructions to the jury pertaining to the definitions of premeditation and intent. However, even if we assume that error was committed, it is rendered harmless by our reversal of the first degree murder conviction, as both of the defendant's instructional challenges are unique to that offense.

**III**

Finally, we reach the defendant's claim that he was denied a fair trial through prosecutorial impropriety in questioning and argument. The defendant takes issue with the following:

(1)   Cross-examination of the defendant which included questions regarding whether other witnesses had lied during their testimony.

(2)   Cross-examination of defense witness Sam Murphy which elicited information that the witness and his pregnant wife had been inconvenienced by having to comply with a defense subpoena.

(3)   The prosecutor's closing argument that no diapers were found inside the victim's apartment, where there was no testimony or other evidence to prove that no diapers were discovered in the apartment.

(4)   Statements during closing argument that were complimentary of defense counsel's abilities but which tended to malign the strength of the defense case – if this defense attorney could not demonstrate aspects of the defendant's defense, then no one could.

Improper questioning or argument is not *per se* reversible error. Rather, the effect of the improper conduct provides the impetus for reversal, if such is warranted. *See Harrington v. State*, 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965) (test is "whether the improper conduct could have affected the verdict to the prejudice of the defendant"). We have previously identified five factors which should be considered in making this determination:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
2. The curative measures undertaken by the court and the prosecution.
3. The intent of the prosecutor in making the improper statement.
4. The cumulative effect of the improper conduct and any other errors in the record.
5. The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

First, with respect to the complaint that the defendant was cross-examined about whether other witnesses had lied during their testimony, the defendant did not object to this line of questioning at trial. He thereby waived appellate review of the issue. *See* Tenn. R. App. P. 36(a); *State v. Glebock*, 616 S.W.2d 897, 906-07 (Tenn. Crim. App. 1981). Although the defendant advocates such to be plain error, we are not compelled to notice it as such. *See generally State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (setting forth requisites which must be present before plain error may be noticed).[1]

The defendant also complains about the cross-examination of Sam Murphy. Apparently, Mr. Murphy was less than pleased to have been subpoenaed by the defense, and he and his pregnant wife spent four days at the courthouse awaiting Mr. Murphy's time on the witness stand. The state's cross-examination brought out this information. The defense promptly objected, and the court sustained the objection, admonished the prosecutor in front of the jury for having pursued the line of questioning, and stated that the witness' displeasure with having been subpoenaed and the length of time involved were irrelevant to the matter on trial. We agree with the trial court that this

---

[1] *Smith* adopted the five-part test of *State v. Adkisson* for determining whether plain error may be noticed:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is 'necessary to do substantial justice.'

*Smith*, 24 S.W.3d at 282 (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App.1994)). *Smith* unequivocally states that all five factors must be established by the record and that the absence of but one of the factors is fatal to a plain error effort. *Smith*, 24 S.W.3d at 283. In the present case, the record does not reveal whether objection to the issue was waived for tactical reasons. This alone is fatal to the defendant's bid for plain error notice, and we need not consider the existence of the remaining four factors.

line of questioning was ill-advised; however, the court took prompt and decisive curative action. We cannot assess the prosecutor's intent from the record before us. It appears that Mr. Murphy was presented as a possible alternative suspect, and it is not unforeseeable or particularly damaging to the defense that an individual in this situation would be displeased about complying with a defense subpoena. Furthermore, there was no physical evidence linking Mr. Murphy to the scene, whereas there was such evidence implicating the defendant. Taking all of these things into consideration in conjunction with the *Judge* factors, we are not compelled to find reversible error.

The remaining complaints of prosecutorial improprieties relate to closing argument. There are five general areas of prosecutorial misconduct relative to closing argument:

1. Intentionally misstating the evidence or misleading the jury regarding permissible inferences;
2. Expressing personal beliefs or opinions regarding the veracity of testimony or evidence or guilt of the defendant;
3. Using arguments designed to inflame the passions or prejudices of the jury;
4. Using arguments which divert the jury from deciding case on the evidence, injecting issues broader than the question of guilt of the defendant under the controlling law, or making projections of consequences of the jury's verdict;
5. Intentionally referring to or arguing facts not in evidence where the facts are not matters of common public knowledge.

*See generally State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

The first of the defendant's two complaints regarding closing arguments relates to the prosecutor's statement that there were no diapers found in the victim's house, when in fact, there was no evidence to indicate whether or not diapers were found. This is a misstatement of the evidence, and we infer from the circumstances and the importance assigned to it in the prosecutor's argument that it was intentional. The defense offered an immediate objection to the argument, and the court instructed the jury to consider the evidence. We have considered the conduct in light of the *Judge* factors, and we conclude that, although the misstatement was significant, the fact that it was an erroneous statement of the evidence was immediately apparent from the defense objection and the court's curative measures. Furthermore, although the misstatement was very germane to the state's case, it was by no means the only or the most significant argument implicating the defendant. Thus, reversal is not required on this basis.

The second allegation of improper argument relates to the prosecutor's complimentary characterization of defense counsel's abilities coupled with the argument that if a distinguished attorney such as defense counsel could not demonstrate the defense to the jury's satisfaction, then no attorney could do so. The defense concedes on appeal that this argument was not, standing alone, so inflammatory and prejudicial as to warrant a new trial, but it argues that its

cumulative effect made it so. Upon careful consideration, we cannot say that this argument falls within any of the *Goltz* categories of improper prosecutorial arguments. As such, no further inquiry is warranted.

Finally, we consider the defendant's bid for reversal based upon the cumulative effect of prosecutorial improprieties. We consider cumulatively the improper questioning of Sam Murphy and the closing argument which misstated the evidence. The sum of these errors, when considered in conjunction with the *Judge* factors, is not such that we are compelled to find reversible error. In particular, the curative measures employed by the court were immediate and appropriate. Moreover, the errors were not so substantial as to overcome the prosecution's case against the defendant. Thus, we are unpersuaded of cumulative error.

In conclusion, we modify the defendant's conviction of first degree murder based upon the prosecution's failure to present sufficient proof of premeditation; we impose a second degree murder conviction. The case is remanded to the trial court for a sentencing hearing on the second degree murder conviction.

_____
JAMES CURWOOD WITT, JR., JUDGE