IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2008

## STATE OF TENNESSEE v. JERMAINE GWIN

**Direct Appeal from the Criminal Court for Shelby County**
**No. 05-05701      James M. Lammey, Jr., Judge**

_____

**No. W2007-02050-CCA-R3-CD  - Filed September 15, 2009**

_____

The Defendant-Appellant, Jermaine Gwin, was convicted by a Shelby County jury of one count of second degree murder, a Class A felony. He received a twenty-year sentence to be served at 100% in the Tennessee Department of Correction. In this appeal, Gwin challenges (1) the sufficiency of the evidence, (2) the admission of a prior bad act under Tennessee Rule of Evidence 404(b), (3) the admission of a photograph of the crime scene (4) the excessiveness of his sentence, and (5) the cumulative effect of the alleged errors. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. C. MCLIN, JJ., joined.

Robert W. Jones, District Public Defender; Phyllis Aluko (on appeal) and William Robilio (at trial); Assistant Public Defenders,  Memphis, Tennessee, for the defendant-appellant, Jermaine Gwin.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; Gregory Gilbert and Muriel Malone, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

Following a jury trial, Gwin was convicted of one count of second degree murder. On June 27, 2007, the trial court sentenced Gwin to twenty years of imprisonment at 100% as a Range I, violent offender. Gwin filed a motion for a new trial on July 25, 2007. The trial court denied this motion by written order on September 4, 2007, and Gwin filed a timely notice of appeal the same day.

### FACTUAL BACKGROUND

**Trial.** Patricia Burks testified that Jeannie Savis, the victim in this case, was her daughter. She stated that her daughter had been living with Gwin for three years when she was killed on March 4, 2005. Her daughter had two children from prior relationships, Michael LaDarius Barr and Deante

Andy, and a one-month-old infant, Jordan Isaiah, with Gwin. At the time of her death, Burks said that her daughter weighed 120 pounds and was five feet, four inches tall and that Gwin was considerably larger than her daughter. After she was notified of her daughter's death, Burks went with her grandson, Michael Barr, when he gave his written statement regarding the incident to the investigator.

Eight-year-old Michael Barr testified that he was present when his mother, the victim, died. Barr stated that Gwin was living with his mother at the time of her death, and he identified Gwin for the court. Barr said that he saw his mother and Gwin arguing in their bedroom on the night of her death. They went downstairs and began arguing over his mother's cell phone. When they came back upstairs, Gwin picked up the black shotgun from the bed. Barr was not sure how the gun got on the bed, but the gun was next to the car seat containing his baby brother. He said that his mother was on her knees near the bed when Gwin pointed the shotgun at her forehead. At the time, neither Gwin nor his mother said anything. Gwin's finger was on the trigger when he heard the shotgun fire and saw his mother lying on the floor motionless. He remembered seeing her blood by the bed and the closet. Shortly thereafter, Gwin got Barr and his brothers and went to Cedrick Anderson's apartment. Barr identified the gun used to kill his mother. He stated that Gwin told him to tell the police that his mother shot herself. Barr said that he refused to do this and told the police the truth about what happened to his mother.

Barr stated that he saw the gun only one time, which was when Gwin shot his mother. He admitted that he did not know who retrieved the gun initially. After being shown his statement to police, Barr recalled that Gwin hit his mother in the eye upstairs before they went downstairs, and his mother scratched Gwin on his neck after they came back upstairs. He saw Gwin put the gun in the closet in the bedroom he shared with the victim. Sometime later, he looked out the window of his bedroom and saw Gwin take the shotgun outside.

Pauline Anderson testified that she and her son, Cedrick Anderson, lived in an apartment building directly behind the one occupied by Gwin and the victim at the time of the victim's death. Ms. Anderson knew Gwin because he played dominos with her son. On Friday, March 4, 2005, she stated that she had gone to sleep early, between 8:00 p.m. and 10:00 p.m., and Gwin knocked on her door and asked to speak with her son. Gwin and her son stepped outside the apartment to talk for about five minutes, and she was unable to hear their conversation. After falling asleep again, she heard a loud bang from the side of her home that awakened her and her son. She believed that the noise was from someone having a blowout on the expressway. She went back to sleep, and some time later, she heard another loud bang which came from behind her home. She got out of bed and told her son "that if the two of them keep playing behind the building [she] was [going to] call the police." She was unable to look outside to see the source of the noise because there were no windows on the back of her home. She drifted off to sleep again and was awakened when Gwin knocked on her door and told them that someone had shot his girlfriend. Ms. Anderson and her son got up to see if they could help the victim. By the time Ms. Anderson entered the apartment shared by Gwin and the victim, her son had already seen the victim and told her not to go upstairs. At that point, Ms. Anderson said she asked her son about the children. Gwin and her son went upstairs to get the children and took them back to the Anderson's apartment. Ms. Anderson said that when Gwin first came to their apartment, he told them that someone shot his girlfriend. Later, he said she shot herself. After everyone returned to her apartment, she and her son tried to calm Gwin down because he was

"[h]ysterical – he was saying he didn't want to go to jail." Gwin was wearing blue jeans and a jacket, and "on the front of his pants, he had blood, and then he had trickles of blood running down . . . both pants legs." Her son asked Gwin about the location of the gun, and Gwin said that he did not know where it was. Once they got back to her apartment, Ms. Anderson said that she called 911 and went outside to watch for the police. She later spoke with the police about the victim's death.

Cedrick Anderson testified that he knew Gwin because they lived in the same apartment complex and would often play dominos together. Mr. Anderson stated that his apartment was about 150 to 200 feet away from the apartment shared by Gwin and the victim. He said that he saw Gwin at approximately 11:30 p.m. on March 3, 2005, the night of the shooting, when Gwin came over to ask if he wanted to play dominos. Mr. Anderson told him that he had already gone to bed for the night, and he would see him some other time. He went back to sleep, and he woke up when he heard a gunshot, which was a fairly common occurrence in their neighborhood. He believed that the gunshot was between his building and Gwin's apartment building. He got up, looked around, and then went back to sleep. He was awakened again when Gwin banged on the door and said, "[H]elp me; my girl, she shot herself." When he opened the door, Gwin was already talking to 911 on his cell phone. He described Gwin's demeanor as "hysterical." He also noticed "blood on [Gwin's] pants and his jacket." He asked Gwin where the gun was, and Gwin said that he did not know. He went back to the apartment with Gwin to check on the victim. He saw the victim lying face-up on the floor in their bedroom with "brain matter, blood, tissue, [and] bone fragments" around her. He said so much of the victim's face was missing that he was unable to perform CPR, and she had no signs of life. He told his mother, Pauline Anderson, not to come upstairs because he did not want her to see the victim, and he stood in the doorway to hide the victim while Gwin gathered the children and sent them to his apartment. At the time, the two older boys were in their bedroom, and the baby was in a carrier on the bed next to the victim. Mr. Anderson said the light was on in the room where the victim was located. The light was also on in the boys' bedroom, and their door was open. Once they gathered the children, he and Gwin went to his apartment next door to wait until the police arrived. Mr. Anderson stated that Gwin continued to behave "hysterical[ly]" at his apartment.

Shameka Perkins, the victim's first cousin, testified that she spoke to the victim at approximately 11:00 p.m. on Thursday, March 3, 2005, the night of the shooting. During that conversation, she heard Gwin yelling in the background but could not understand what he was saying because his speech was slurred. The victim told her that she and Gwin had just finished playing dominos. Perkins stated that she had seen the victim and Gwin play dominos and other games in the past, and Gwin would always get angry when the victim would win.

Jennifer Stewart, a patrol officer with the Memphis Police Department, testified that on March 4, 2005, she was dispatched to the apartment occupied by Gwin and the victim. Upon her arrival at approximately 1:30 a.m., she spoke to Pauline Anderson, who told her that the victim "shot herself." Officer Stewart and her partner, Officer Smith Boyland, walked up to the apartment, and Gwin and Cedrick Anderson came out and told them that they did not believe that the victim was "okay." She described Gwin's appearance when they arrived on the scene:

> [H]e had blood on his pants. He was just wearing blue jean pants and like a
> white – it looked like a woman's coat. It looked like it was too small for him – with
> no shirt underneath. He had blood from his knees down, pretty much. And like I said,

he was very emotional at that time. He said he didn't know what was going on. You know, at first he said [the victim] did it; he didn't know if she was okay. Again, he was very emotional.

Later, after we left the building to see if there [were] any signs of life, and when we went to secure him to pat him down for officer safety to check for weapons, we observed several scratches on his chest because it was very odd that the gentleman had no shirt on, and that's pretty much what I remember him looking like that night.

She later noticed that Gwin had "pieces of brain matter below his knee on his pants."

Officer Stewart stated that when she and Officer Boyland walked upstairs, they observed "a young lady's feet sticking out of the doorway with the door open, and it appeared to be the bedroom." After they observed no movement, they entered the bedroom and saw the victim on the floor. Her body was at an angle beside the bed with her feet in the doorway. They saw blood and brain matter near the body. She described the victim's appearance:

She – as I was saying, she was face down, and it looked like her head – she was either beaten severely with a blunt object or possibly shot with a large-caliber gun – most likely a shotgun. Half of her face was . . . hanging off of her head. And, like I said, that's where most of the brain matter and blood was all on the floor in one puddle.

The victim was face down, and Officer Stewart could not determine if she was breathing. Because the officers had been trained not to touch a victim, Officer Stewart immediately called for an ambulance in case the victim was alive.

Officer Stewart spoke to Gwin, who told her that he had arrived home around midnight. Gwin told the officers that he discovered the victim and that "she had shot herself." At that point, a third officer, Michael Stewart, arrived and secured Gwin in his car. She remembered Gwin smelling of alcohol when he was first handcuffed. She heard Officer Michael Stewart ask Gwin why he smelled of alcohol when he had just come home from work, and Gwin said that he stopped and had some drinks with some friends before coming home. Officer Stewart said she secured Pauline Anderson in her car, and Officer Boyland secured Cedrick Anderson in his car.

Officer Stewart stated that she and the other officers looked for the gun because in most suicide cases, "the gun is immediately beside [the body] or within [the body's] range of reach – or, in something like that, she might have [fallen] on it, [although] there was nothing underneath her or in her immediate reach." However, she said they were unable to locate the gun during their search.

Michael Stewart, a patrol officer with the Memphis Police Department, testified that he responded to the victim's address at approximately 1:30 a.m. on March 4, 2005. Upon his arrival, he spoke to Pauline Anderson, who told him that Gwin was at her apartment. He then proceeded to the Anderson's apartment, which was directly west of the victim's apartment. He approached Gwin and noticed that he had some blood on his pants. He brought Gwin to his patrol car and asked him what happened. Gwin responded that he had come home and discovered his girlfriend shot. At first,

Gwin told him that the gunshot wound was self-inflicted and that he got home around midnight. Gwin later said that he arrived home at 10:00 p.m. and did not contact the police because he was "scared." Officer Stewart said he entered the victim's apartment only once when he was trying to help the other officers locate the weapon. As he was searching for the weapon, he saw the victim in the floor with her head at the foot of the bed and her feet towards the doorway.

He described Gwin's demeanor when he arrived at the scene:

> Initially he was fairly calm, which was a strange reaction. He didn't have a T-shirt on. He had on a jacket, and his jacket and pants were stained with blood.
>
> Initially, when I asked him why he didn't have a shirt on, he said he was concerned about getting blood on his shirt. When I asked him why he was so concerned about his shirt and not his pants, he told me he just takes his shirt off routinely when he comes in the house.

Officer Stewart stated that he also observed a few scratches on Gwin's chest. He stayed with Gwin for several hours before transporting him to the homicide office for questioning.

Kay Turnmire testified that she was a crime-scene officer with the Memphis Police Department at the time that she worked on this case. She arrived at the scene on March 4, 2005, between 10:15 a.m. and 10:30 a.m. Sergeant Mullins informed her that they had found a weapon behind the apartment complex, and he asked her to photograph, collect, and tag the gun. As she was checking the gun for safety reasons, she discovered one spent hull of the shell inside the shotgun. Officer Turnmire identified the gun in evidence as the one she collected behind the victim's apartment. She described how the shotgun was fired: "[I]t's a pump-action shotgun, and you have to slide the shell inside the weapon and then pump it up there to get it to fire. And then, of course, you would just pull the trigger." Officer Turnmire stated that she did not collect any fingerprints from the shotgun.

Anthony Mullins, a sergeant with the Memphis Police Department, testified that he began working on this case when his supervisor notified him that a woman had been fatally shot at 1803 St. Phillips on March 4, 2005. He was initially contacted because the felony-response investigators determined that there were suspicious circumstances surrounding the victim's death. He arrived at the scene at approximately 4:00 a.m. The victim's death had been initially reported as a possible suicide. However, he believed that the circumstances of a possible suicide in this case were suspicious because the weapon had not been found. In addition, he stated that he is always suspicious of a female suicide where the shot is to the head because most female suicides are shots to the chest. He also stated that there were no signs of forced entry, as in the case of an intruder who breaks in and then kills a victim.

Sergeant Mullins stated that he interviewed the child witness, Michael Barr, in the presence of his maternal grandmother. He said the child was able to communicate with him, and he asked him very simple questions because the child was only six years old and had just witnessed a very traumatic event. He said that the child was able to review his typed statement with the help of his grandmother at the conclusion of the interview. Sergeant Mullins stated that the child told him the

weapon was a long gun rather than a pistol and that the weapon had to be pumped before it would fire, which was consistent with the pump shotgun that was recovered.

Sergeant Mullins said that he returned to the scene at approximately 9:00 a.m. on March 4, 2005, to recheck the scene and locate the weapon. When he and the other officers conducted a second search of the victim's apartment, they found twenty-two caliber ammunition and twelve gauge shotgun ammunition in the master bedroom closet.

Mark Rewalt, a lieutenant with the Memphis Police Department, testified that he was a sergeant in the homicide division when he was notified of the victim's death. Although he and the other officers were initially told that the case was a female suicide, they could not find a weapon to substantiate that cause of death. As a part of his investigation, Lieutenant Rewalt said he discovered a domino score sheet in one of the dining room chairs listing the players as the victim, Gwin, and Cedrick Anderson. He saw that a radio had been smashed under one of the dining room chairs. In the master bedroom he observed blood on the floor and wall next to the bed. Lieutenant Rewalt was shown Exhibit 30, a photograph depicting the pool of blood and skull material next to the bed in the master bedroom. He was also shown several photographs of Gwin, depicting a scratch on the left side of his chest below his collarbone, a tattoo on his neck, a bandage on his stomach, and an overall picture of Gwin in his bloody clothes. These photographs were admitted into evidence. Lieutenant Rewalt said that after going to the homicide bureau, he returned to the scene to search the Anderson's apartment. While Sergeant Mullins searched the inside of the Anderson apartment, Lieutenant Rewalt said he continued to search for the weapon. After a forty-five minute search, he found a twelve-gauge pump shotgun along a fence line behind the Anderson's apartment. He identified the shotgun in evidence as the weapon he found on March 4, 2005. He took a statement from Cedrick Anderson, wherein he asked him if he had ever seen Gwin ever physically assault the victim. Cedrick Anderson responded, "No. She has given [Gwin] a black eye before." However, Lieutenant Rewalt acknowledged that he never asked Cedrick Anderson if he actually saw the victim give Gwin the black eye.

Doreen Shelton, a lieutenant with the Memphis Police Department, testified that she was sergeant with the homicide division when she investigated the victim's death in this case. Her involvement in the case was limited to questioning Gwin at the homicide office. Gwin signed the Miranda waiver form on March 4, 2005 at 10:37 a.m. The form was also signed by Lieutenant Shelton and Sergeant Carter. Although Lieutenant Shelton did not investigate the scene, she stated that Sergeant Mullins informed her of the vital information at the scene, including the description of the room. She also asked Gwin if he was intoxicated or under the influence of drugs prior to taking his statement. Gwin told her that although he had drunk some alcohol approximately twelve hours before, he was no longer intoxicated. Lieutenant Shelton stated that Gwin told her three different versions of what happened leading up to the victim's death. First, Gwin said that he came home from work and found the victim on the floor. Gwin "told her to wake up and then ran to the neighbors to get help." The first version of events "implied that the victim shot herself." However, "[t]he wound did not [equate with] being shot by oneself with a shotgun." She voiced these concerns to Gwin, and he gave her a second version of events. In the second version, Gwin and the victim struggled over the shotgun, "with both of their fingers on the trigger, [and the gun] went off." Based on the information she obtained from Sergeant Mullins, she informed Gwin that his second version of the events was also impossible because the angle of the injury was pointed downward. Gwin then gave her the third version of events. The third version was that Gwin saw the victim with the shotgun, he

grabbed it from her, she fell, and then he shot her in the eye. Lieutenant Shelton said she began interviewing Gwin at 8:00 a.m., and she obtained a written statement from him regarding his third version of events at 1:00 p.m. During this time, Gwin was able to eat, use the restroom, and smoke cigarettes. He was also advised of his constitutional rights before the interview began and before his written statement was typed, and he indicated that he understood his rights each time. In his written statement, Gwin acknowledged that he was responsible for the victim's death at around 1:30 a.m. on March 4, 2005. Gwin stated:

> First, I got off work at 10:00 P.M., and I went in there, and she was doing her hair. Then we started playing Dominos and drinking. Next thing you know, we got into an argument and [she] got the gun and said these words – 'Boy, you better stop playing me with these hos.' I ran into the bathroom, and she came up the stairs. She kicked the door. I came out, snatched the gun. She fell on the ground, and I shot her. Then I went over to my neighbor's house and called the police.

He said that the baby was in the master bedroom in his car seat and the other two children were in their bedroom asleep when he fired the shot. He threw the shotgun in the back of the apartment complex. When he was asked to review his statement, Gwin added the following language: "I am sorry that it happened that way. I didn't mean for her to die, and we were going to get married on her birthday. We was [sic] already engaged. I'm very sorry." He also added, "I know it was the alcohol and drugs."

Dr. Marco Ross, the Shelby County Medical Examiner and a forensic pathologist, was tendered an expert in the field of forensic pathology. Dr. Ross stated that he reviewed the court litigation packet compiled by Dr. Chancellor, the medical examiner who performed the autopsy on the victim. He stated that he adopted Dr. Chancellor's conclusion that the victim's cause of death was a shotgun wound to the head as a result of a homicide. Dr. Ross stated that the victim's injury was a circular wound in the area of the left eye with four distinct abrasions consistent with a shotgun wound at close range. He also stated that Dr. Chancellor recovered small birdshot type pellets inside the victim's head and in the tissues in the orbital area. In this case, the plastic cup surrounding the pellets separated to form "a four-petaled patterned object" which caused four rectangular abrasions on the victim. These rectangular abrasions were consistent with firing a shotgun from a distance of one to three feet away from the victim. Dr. Ross also stated that the victim's wound was not a contact wound because there was no soot disposition around and in the wound and there were no abrasions from the muzzle of the gun. The trajectory of the pellets was from the front of her head to the back and from the left side to her right side. He also determined that the barrel of the gun could not have been pointing up and would have "been pretty much level with the eye socket – maybe off to the side a little bit." The victim suffered multiple skull fractures from the shotgun wound. She also suffered massive injury to her brain where the pellets sheered off the right and left part of the brain and separated the upper part of the brain from the brain stem. Dr. Ross determined that the shotgun wound was a lethal injury that victim could not have survived even if medical help had arrived almost immediately. The victim did not suffer any other injuries other than from the shotgun wound. The level of the alcohol found in the victim's blood was .06 percent. Dr. Chancellor's autopsy revealed that the victim was five feet, six inches tall and weighed one hundred and twenty-four pounds.

At the close of the State's proof, the defense made a motion for a judgment of acquittal, which the trial court denied. The defense's proof consisted of the testimony of Jermaine Gwin and Pauline Anderson.

Jermaine Gwin, the Defendant-Appellant, testified that the victim had been his girlfriend for the last three or four years. He and the victim had one child together, who was one month old at the time of the victim's death. Gwin stated that he and the victim had an "altercation" on March 3, 2005, at approximately 11:00 or 11:30 p.m. After getting home from work, he went over to Cedrick Anderson's house to see if he wanted to play dominos. Cedrick told him he was not interested. He left and went to his own apartment and went upstairs to talk to the victim. He asked the victim if she would like to play dominos, and she agreed. As they were playing, Gwin said that he was drinking "Paul Mason" and smoking marijuana. He stated that the victim was also drinking "Paul Mason." Then the victim stated, "You don't go playing with all these [whores]." Gwin told her that he was simply talking to the women, and the victim "ran over [to] the couch, grabbed the gun." Gwin said that the shotgun was normally kept under his night stand. He said that prior to the victim grabbing the gun, he had not hit her, although she had scratched him on his collarbone. At the time of the altercation, they were both intoxicated. Gwin ran to the upstairs bathroom, and the victim began kicking the door to the bathroom. He started panicking because the victim had chased him around the apartment complex with a knife on a previous occasion. Gwin came out of the bathroom, "snatched the gun and then shot her." At the time that he shot her, Gwin said that he was scared and panicking.

Gwin stated that the victim was standing at the time he shot her. Once he fired the shot, the gun fell down, he checked her pulse, and he held her crying. At the time, he was wearing a white coat, blue pants with blood stains on them from holding her, and some tennis shoes. He took the shotgun and hid it in the bushes because he was scared. He then ran to Cedrick Anderson's apartment and told him he needed help because his girlfriend had shot herself. At the same time, he called 911 and told them that he had gotten off of work at 10:00 p.m. and had come home to find his girlfriend shot. Gwin also confirmed that he told the children to say that their mother shot herself. He said that he lied about the victim's cause of death because he was scared that he was going to jail even though it was an accident. He and Cedrick came back to the apartment and took the children back to the Anderson's apartment.

When Gwin arrived at the police station, he said that Sergeant Oliver started asking him questions about what happened with the victim that night. Gwin told Sergeant Oliver that the victim had shot herself. He said that when Sergeant Doreen Shelton questioned him, she kept asking him what had happened. He said that he gave her two different versions of what happened before giving her the third version that he signed.

Gwin described two previous occasions where the victim chased him with a knife. The first incident was when the victim attempted to stab him with a knife through a door. He started swinging a broomstick and accidentally hit her in the head before running out. The second incident was when they were fighting regarding another woman. She chased him around the Oakshire apartment complex with a knife. He said that he ran away, and the victim turned around and went back into their apartment. Gwin stated that the victim had never physically assaulted him, other than these two incidents. He also said he had never physically assaulted her unless she assaulted him first.

Pauline Anderson testified a second time during the defense's case-in-chief that she observed Gwin and the victim fighting on Super Bowl Sunday, a few weeks before the victim's death. She saw the victim chasing Gwin with a steak knife across the parking lot of their apartment complex while Gwin yelled obscenities at her. The victim was pregnant at the time, and she stopped before she made it across the parking lot to Gwin. Ms. Anderson stated that she did not know how the argument between the victim and Gwin began. When Gwin came over to Ms. Anderson's apartment to watch the game a few minutes later, she said he did not have any visible injuries.

The State presented one rebuttal witness. Dalya Howell, the victim's first cousin, testified that she had once lived with the victim and Gwin. She stated that she called the police in October of 2004 because she witnessed Gwin hit the victim. Howell said that she saw Gwin and the victim running down the stairs, and the victim tried to get her car keys away from Gwin. She said that she did not see the victim hit or push Gwin. However, she saw Gwin hit the victim on the side of her face with his fist. The hit was hard enough for the victim to step backwards, and her face began to swell. Gwin left the apartment before the police arrived. Howell said that she was not present when the argument between Gwin and the victim began. She stated that the victim never prosecuted Gwin regarding the incident.

The defense renewed its motion for judgment of acquittal at the conclusion of Howell's testimony. The State responded that in light of Gwin's testimony, his state of mind at the time that he killed the victim was even more in question. The trial court denied the motion stating that there was "ample proof to go to the jury on this case on the charge of murder second-degree."

**Sentencing Hearing.** At Gwin's sentencing hearing on June 28, 2007, the parties agreed that Gwin would be sentenced under the old sentencing law. The State argued that the following enhancement factors should be applied in this case:

> (6) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
> (7) The personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great;
> . . . .
> (10) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;
> (11) The defendant had no hesitation about committing a crime when the risk to human life was high;
> . . . .
> (17) The crime was committed under circumstances under which the potential for bodily injury to a victim was great[.]

T.C.A. § 40-35-114(6), (7), (10), (11), and (17) (2003). The State ultimately recommended a sentence of twenty-five years, the maximum sentence in the range. See id. § 40-35-112(1) (2003). Defense counsel argued against the enhancement factors suggested by the State and argued for several mitigating factors. These non-statutory mitigating factors were that Gwin cooperated with the authorities, expressed remorse, had no criminal record, and was gainfully employed. The trial court declined to apply any of the mitigating factors. The court then considered several of the enhancement factors but determined that none of the factors could be applied because they were not found by a

jury. The trial court sentenced Gwin as a Range I, violent offender and imposed a sentence of twenty years at 100% in the Tennessee Department of Correction.

## ANALYSIS

**I. Sufficiency of the Evidence.** Gwin argues that the evidence was insufficient to provide the mens rea requirement for second degree murder and that his motion for judgment of acquittal should have been granted by the trial court. He also argues that he was legally justified in killing the victim because he acted in self-defense. In response, the State argues that there was sufficient evidence of a knowing killing and that the jury properly rejected Gwin's claim of self-defense. We agree.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." State v. Philpott, 882 S.W.2d 394, 398 (Tenn. Crim. App. 1994) (citing State v. Cabbage, 571 S.W.2d 832, 836 (Tenn. 1978)), superseded by statute on other grounds as stated in State v. Barone, 852 S.W.2d 216, 218 (Tenn. 1993). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

Second degree murder is defined as a "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2003). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b) (2003).

Gwin argues that he killed the victim in self-defense. Tennessee Code Annotated section 39-11-611(b)(2) (2003), which was in effect at the time of the offense, states:

A person is justified in threatening or using force against another person when, and to the degree, the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must

have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

The jury, as the trier of fact, determines whether the defendant acted in self-defense. State v. Dooley, 29 S.W.3d 542, 547 (Tenn. Crim. App. 2000) (citing State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997)). "[I]n the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." Id. The State has the burden of negating the defendant's claim of self-defense in the event that "admissible evidence is introduced supporting the defense." T.C.A. § 39-11-201(a)(3) (2003); see also State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

After considering the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to convict Gwin of second degree murder. Michael Barr, the victim's six-year-old child and the only eyewitness to the killing, testified that the victim was on her knees at the time that Gwin pointed the shotgun at her and pulled the trigger. Barr also testified that Gwin hid the gun behind the apartment complex shortly after the shooting. Cedrick and Pauline Anderson and all of the investigating officers testified that Gwin initially told them that the victim committed suicide. Dr. Marco Ross testified that he adopted Dr. Chancellor's conclusion that the victim's cause of death was a shotgun wound to the head as a result of a homicide. Although Gwin testified that he killed the victim in self-defense because he reasonably believed that the victim was going to kill or seriously injure him, the jury heard his testimony as well as the testimony of the other witnesses at trial and rejected Gwin's self-defense claim. Upon review of the record, there was ample proof that Gwin knowingly killed the victim. Accordingly, Gwin is not entitled to relief on this issue.

**II. Tennessee Rule of Evidence 404(b).** Gwin contends that the trial court erred in allowing the State to present evidence through Dalya Howell of his alleged prior assault on the victim. Specifically, he contends that the trial court failed to determine whether proof of the prior bad act was clear and convincing under Tennessee Rule of Evidence 404(b). In response, the State argues that the trial court properly allowed the evidence of a prior assault to rebut Gwin's claim that he was fearful of the victim and that the victim was the first aggressor. In addition, the State contends that the trial court substantially complied with the requirements of Rule 404(b). Finally, the State argues that Gwin should not be entitled to any relief because the trial court gave the jury a limiting instruction regarding the prior bad act. We agree with the State's arguments regarding this issue.

Rule 404(b) states:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are: (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Assuming a trial court substantially complies with the requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). However, if a trial court fails to substantially comply with the requirements of the rule, then the trial court's decision is not entitled to deference by the reviewing court. DuBose, 953 S.W.2d at 652.

"Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible." State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). Rule 404 "establish[es] that character evidence cannot be used to prove that a person has a propensity to commit a crime." Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626, 645 (Tenn. Crim. App. 1994). Trial courts should take a "restrictive approach [to] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). The more similar the conduct or act to the crime for which the defendant is on trial, the greater the potential for a prejudicial result. McCary, 119 S.W.3d at 243 (citing State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995)). Other crimes, wrongs or acts are admissible under Rule 404(b) when relevant to an issue other than the defendant's character, such as intent, motive, identity, common scheme or plan, or absence of mistake. Id. In addition, "violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim." State v. Smith, 868 S.W.2d 561, 574 (Tenn. 1993) (citing State v. Turnbill, 640 S.W.2d 40, 46-47 (Tenn. Crim. App. 1982); State v. Glebock, 616 S.W.2d 897, 905-06 (Tenn. Crim. App. 1981)).

Here, the State requested that Gwin's prior assault on the victim be admitted. The State notified the court that Dalya Howell saw Gwin hit the victim during an altercation over car keys that occurred approximately five months prior to the victim's death. The hearing on this motion was held outside the presence of the jury. In determining whether a material issue existed other than conduct conforming with a character trait, the trial court stated:

Well, the state has to show this was a knowing killing. And the state . . . can prove that it was an intentional killing, which satisfies knowing as well. So . . . the state has the burden of proof that this is an intentional or knowing killing to prove murder in the second degree.

Regarding whether proof of the prior bad act was clear and convincing and whether the probative value of the evidence was outweighed by the danger of unfair prejudice, the court stated:

[U]nder the facts that I've just been told . . . the probative value is very important – this evidence that's a prior act [is] very indicative of a willingness to harm – [a] settled purpose to harm, or the willingness to inflict bodily injury for almost no reason. It's

-12-

definitely relevant to the intent of the defendant, and it sounds like there's enough proof to that effect as to the prior act. There's nothing to speculate about as to who the first aggressor was or – and, of course, I find that it's probative value outweighs the prejudicial effect in light of the facts that I've been given.

Although the trial court did not explicitly make a clear and convincing evidentiary determination, it stated, "[I]t sounds like there's enough proof to that effect as to the prior act." Accordingly, we conclude that the trial court substantially complied with the procedural requirements of Rule 404(b). See State v. Ray Anthony Nelson, No. 03C01-9706-CR-00197, 1998 WL 694971, at *8-9 (Tenn. Crim. App., Knoxville, Sept. 9, 1998) (stating that the trial court substantially complied with Rule 404(b) when it met all the requirements of the rule except the need to make a clear and convincing evidence determination).

Therefore, we must review this issue under an abuse of discretion standard. Despite the fact that the trial court ruled this evidence was admissible, the State did not present the evidence during its case-in-chief. Instead, the State presented the prior bad act evidence as rebuttal evidence. During the defense's case-in-chief, Gwin testified that he was scared of the victim and Pauline Anderson testified that she observed the victim chasing after Gwin with a steak knife on a previous occasion. Following this testimony, the trial court allowed the State to present Dalya Howell's rebuttal testimony that she observed Gwin hit the victim in the face on a prior occasion. Upon review, we conclude that the trial court did not abuse its discretion in allowing the admission of the prior bad act evidence. Gwin's prior assault of the victim showed his intent and his settled purpose to harm the victim on the night the victim was killed. In addition, the evidence rebutted Gwin's claim of self-defense and his claim that the victim was the first aggressor. After reviewing the record, we conclude that the probative value of the prior bad act outweighed its prejudicial effect on Gwin. Furthermore, we note the trial court's limiting instruction:

> If, from the proof, you find that the defendant has committed an act of prior misconduct, other than that to which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial. The evidence may only be considered by you for the limited purpose of determining whether it tends to show:
>
> (A) The defendant's intent, that is, such evidence may be considered by you if it tends to establish the defendant actually intended to commit the crime with which he [is] presently charged.
>
> (B) Guilty knowledge or lack of mistake. That is such evidence may be considered by you where guilty knowledge is an essential element of the crime charged, and evidence of the other offense tends to establish that the defendant possessed this knowledge at the time of the commission of the crime presently charged.
>
> (C) The defendant's hostility towards the alleged victim and his settled purpose to harm or injury her.

If the evidence in this case leads you to believe that the alleged act or prior misconduct is untrue and never occurred, you should disregard it. You are the sole judges of what weight should be given to an act of prior misconduct, and you should consider it along with all the other evidence in the case in determining the defendant's guilt or innocence.

Such evidence of an alleged act of prior misconduct, if considered by you for any purpose, must not be considered for any other purpose other than that specifically stated above.

We must presume that the jury followed the limiting instruction regarding this Rule 404(b) evidence. See State v. Jordan, 116 S.W.3d 8, 18 (Tenn. Crim. App. 2003) (citing State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983)). We conclude that the trial court did not abuse its discretion in admitting the prior bad act, and the limiting instruction further ensured that the jury would not consider the prior bad act as propensity evidence. Accordingly, Gwin is not entitled to relief on this issue.

**III. Admission of Photograph.** Gwin argues that the trial court erred in admitting Exhibit 30, a photograph depicting the pool of the victim's blood and skull material next to the bed in the master bedroom, because it was highly prejudicial and cumulative. He contends that Exhibit 30 "unnecessarily emphasized the amount of blood found at the crime scene." In response, the State contends that the trial court did not abuse its discretion in admitting Exhibit 30 because the photograph showed where the victim came to rest after being shot and corroborated Michael Barr's testimony that he saw his mother being shot. The State further argues that Exhibit 30 "was not excessively gruesome or unnecessarily cumulative." We agree.

The trial court has discretion regarding the admissibility of photographs, and a ruling on this issue "will not be overturned on appeal except upon a clear showing of abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). First, a photograph must be "verified and authenticated by a witness with knowledge of the facts" before it can be admitted into evidence. Id. Second, a photograph must be relevant to an issue that the jury must determine before it may be admitted. State v. Vann, 976 S.W.2d 93, 102 (Tenn. 1998) (citing State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994); State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978)), cert. denied, 67 U.S.L.W. 3641 (U.S. Apr. 19, 1999) (No. 98-7661). However, if the photograph's "prejudicial effect outweighs its probative value," it should not be admitted. See Tenn. R. Evid. 401 and 403; Banks, 564 S.W.2d at 951. A relevant photograph "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See Banks, 564 S.W.2d at 951. Unfair prejudice has been defined by the Tennessee Supreme Court as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Id. Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Id.

Here, the defense objected to Exhibit 30 on the basis that it was highly prejudicial and cumulative. The State argued that the pictures established the location that the victim came to rest

-14-

and corroborated Michael Barr's testimony that he saw Gwin shoot his mother from the vantage point of his bedroom. The trial court ruled that Exhibit 30 was admissible:

> I think it's also indicative of the tremendous amount of – without showing the actual body and the damage. For the record, it's not a very clear picture, it's very dark, and it appears to be a pool of blood. I can't see anything other than that, myself, and it doesn't – it doesn't look particularly inflammatory. I guess they could have taken a picture of the body – I'm sure they did – while it was lying there. I think this would indicate, without being too graphic, the location – at least where the victim's head was and the extent of the injury without actually showing them the injury. So, I'm going to note your exception but allow it.

We conclude that the trial court did not abuse its discretion in admitting Exhibit 30. We agree with the State's arguments that the photograph was necessary to show where the victim fell after being shot and to determine the legitimacy of Michael Barr's testimony that he saw Gwin shoot his mother from his bedroom. The probative value of Exhibit 30 outweighed any unfair prejudice, and the photograph was not needlessly cumulative. Accordingly, Gwin is not entitled to relief on this issue.

**IV. Sentence.** Gwin contends that his sentence was excessive because the trial court applied enhancement factors in violation of Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004), despite the fact that court imposed the presumptive twenty-year sentence. He additionally contends that his sentence is excessive because the trial court failed to properly consider the relevant mitigating factors. In response, the State argues that "[b]ecause the trial court imposed the presumptive sentence and properly found that no mitigating factors applied in this case, Blakely is not implicated, and the defendant's sentence is proper." We agree.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The defendant, not the State, has the burden of showing the impropriety of the sentence. Sentencing Comm'n Comments, T.C.A. § 40-35-401(d) (2003). This means that if the trial court followed the statutory sentencing procedure, made adequate findings of fact that are supported by the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, this court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). Although the trial court failed to expressly consider the purposes and principles of the Sentencing Act, as outlined by Tennessee Code Annotated sections 40-35-102 and -103, we recognize that it incorporated these purposes and principles when imposing the presumptive minimum sentence. Therefore, our review is de novo with a presumption of correctness. See Ashby, 823 S.W.2d at 169.

A trial court, when sentencing a defendant, must consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;

-15-

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114; and

(6) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b) (2003); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

Although the date of the second degree murder offense was March 4, 2005, Gwin was not sentenced until June 28, 2007. The transcript from the sentencing hearing shows that Gwin was sentenced under the pre-2005 sentencing act. We note that Gwin could have elected to be sentenced under the June 7, 2005, amendments to the sentencing act, which complied with Blakely v. Washington, so long as he executed a waiver of his ex post facto protections. See 2005 Tenn. Pub. Acts ch. 353, § 18. Blakely held that "'[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" Blakely, 542 U.S. at 301, 124 S. Ct. at 2536 (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed.2d 435 (2000)). Here, Gwin's sentence is governed by the pre-2005 sentencing act since he agreed to be sentenced under this act at his sentencing hearing.

The pre-2005 sentencing act required the trial court to begin its determination of the appropriate sentence with a "presumptive sentence." T.C.A. § 40-35-210(c) (2003). For Class A felonies, the presumptive sentence was the midpoint of the appropriate range for the offense. Id. When there were enhancement factors but no mitigating factors for a Class A felony, the trial court was required to set the defendant's sentence at the midpoint of the range or above the midpoint of the range. Id. § 40-35-210(d) (2003). When there were mitigating factors but no enhancement factors for a Class A felony, the trial court was required to set the defendant's sentence at the midpoint of the range or below the midpoint of the range. Id. Finally, when there were enhancement factors and mitigating factors for a Class A felony, the trial court was required to "start at the midpoint of the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." Id. § 40-35-210(e) (2003).

For the purposes of appellate review, our supreme court requires the following of the trial court:

[T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994), superseded by statute on other grounds as stated in State v. Carico, 968 S.W.2d 280, 288-89 (Tenn. 1998).

In this case, Gwin was sentenced as Range I, violent offender. See T.C.A. § 40-35-105 (a), (b), -501(i) (2003). Second degree murder, a Class A felony, has a sentence range of fifteen to twenty-five years. Id. § 40-35-112(1) (2003). The presumptive sentence or the midpoint in the range for second degree murder is twenty years. Id. § 40-35-210(c) (2003).

Here, the State's proof consisted of the presentence report and a victim impact statement by the victim's mother. In addition, the State asked that the trial court apply several enhancement factors. The defense argued against the enhancement factors suggested by the State and argued for several non-statutory mitigating factors, which were that Gwin cooperated with the authorities, expressed remorse, had no criminal record, and was gainfully employed. The defense offered no proof of these mitigating factors at the sentencing hearing. The trial court declined to apply any mitigating factors to Gwin's sentence:

> Well, I guess, you know, he made it three years without committing a crime as an adult. I guess that's something, but I find – I don't find that he really assisted the authorities. I think it was more or less he was backed into a corner; and every time they would confront him with what he said just didn't make sense, he actually tried to [elude] prosecution – he tried to make it appear as if he was not involved or that she actually did it to herself. That doesn't sound to me like he cooperated.

> And then he even says that it was an accident, and I see no proof that it was an accident. It's almost illogical that someone could shoot themselves or accidentally get shot at point-blank range in the eye with a shotgun. Someone had to load it. Someone had to fire it. And to be so clearly and so distinct – a shotgun blast with birdshot to where it appears to be one – I don't see where that could have been possibly accidental, so, yeah, he even – even the last thing he said to them about it being an accident was not the truth.

> So, I find that no criminal adult record – in light of the fact that he had so much as a juvenile, it really – I don't think that mitigates this one iota.

The trial court considered several enhancement factors but determined that none of them could be applied because they were not found by a jury:

> What also concerns me with the state of the law as it existed at the time – and most of these things that we just talked about, I think our Supreme Court says now that it should have been found by a jury. So, for that reason, I'm going to sentence the defendant, Mr. Gwin, to twenty years because I find no mitigation to lower that from twenty years.

As we previously stated, our review is de novo with a presumption of correctness. See Ashby, 823 S.W.2d at 169. However, upon our review, we conclude that the trial court did not err in failing to apply mitigating factors to Gwin's sentence and that Gwin's twenty-year sentence was proper. We note that the defendant has the burden of proving applicable mitigating factors. State v. Mark Moore, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App., at Knoxville, Sept. 18, 1995) (citing T.C.A. § 40-35-401(d)). In this case, the defense failed to provide any proof of any of

the non-statutory mitigating factors at the sentencing hearing.  Accordingly, Gwin is not entitled to relief on this issue.

      **V.**   **Cumulative Effect of Errors.**   Gwin argues that the cumulative effect of the aforementioned alleged errors violated his right to a fair trial and due process.  The State declined to address this issue.  Because we have already determined that Gwin is not entitled to relief on any of the previous issues, we conclude that there is no cumulative error that affected his right to a fair trial or due process under the United States Constitution or the Tennessee Constitution.

## CONCLUSION

Upon review of the record, we conclude that the evidence was sufficient to convict Gwin of second degree murder, the admission of a prior bad act was proper, the admission of Exhibit 30 was proper, Gwin's sentence was not excessive, and Gwin was not denied his right to a fair trial and due process because of the cumulative effect of the alleged errors in this case.  The judgment of the trial court is affirmed.

_____  _____
                                               CAMILLE R. McMULLEN, JUDGE